Tab C

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF KENTUCKY AT LOUISVILLE


AMIR SHAEIGAN,

                Plaintiff,

vs.                                Case No.
                                3:12-CV-762-S

HD SUPPLY, INC.,

and

NAJDAT HAYDAR,


                Defendants.

_____/


VIDEOTAPED DEPOSITION OF

STEVEN MARGOLIUS

Taken at San Diego, California

April 23, 2015




Reported by Deborah M. Neeley - CSR, RPR,
Certificate No. 8773


**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

Page 2

1        On Thursday, April 23, 2015, commencing at

2    the hour of 9:10 a.m., at 4747 Executive Drive,

3    Suite 1000, in the City of San Diego, County of

4    San Diego, State of California, before Deborah M. Neeley,

5    Registered Professional Reporter, Certified Shorthand

6    Reporter, in and for the State of California, personally

7    appeared:

8                    STEVEN MARGOLIUS,

9    called as a witness by the plaintiff, and, who, being by

10   me first duly sworn, was thereupon examined and testified

11   in said cause:

12                A P P E A R A N C E S

13   FOR THE PLAINTIFF:

14        CONLIFFE SANDMANN & SULLIVAN
          BY:  TED LASLEY, ESQ.
15        2000 Waterfront Plaza
          325 West Main Street
16        Louisville, Kentucky 40202
          (502) 587-7711
17        tlasley@cssattorneys.com

18   FOR THE DEFENDANTS:

19        FISHER & PHILLIPS, LLP
          BY:  RAYMOND C. HALEY, ESQ.
20        220 West Main Street, Suite 2000
          Louisville, Kentucky 40202
21        (502) 561-3986
          rhaley@laborlawyers.com

22

23   ALSO PRESENT:

24        SCOTT TANAKA, VIDEOGRAPHER
          DALLAS VIDEO CONCEPTS
25        (214) 432-5762

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1                        I N D E X

 2   Deposition of Steven Margolius
     April 23, 2015
 3

 4   EXAMINATION                                    PAGE

 5   By Mr. Lasley                                    4

 6

 7                   INDEX OF EXHIBITS

 8   FOR DEFENDANTS:                                PAGE

 9   Exhibit 1      E-mail from Haydar Najdat dated
                    3/27/2012 to Steve Margolius with
10                  attachment of Performance Plan
                    Amir Shaiegan; 2 pages            39
11

12   Exhibit 2      E-mail from Najdat Haydar dated
                    3/1/2012 to Amir Shaiegan with
13                  attachment of Important Bonus
                    Communication; 1 page             49

14   Exhibit 3      Separation Agreement & Release
                    of Claims for Amir Shaiegan;
15                  5 pages                           76

16   Exhibit 4      Separation Agreement & Release
                    of Claims for Najdat Haydar;
17                  5 pages                           78

18   Exhibit 5      Notice to take video deposition
                    of Steve Margolius; 2 pages       94
19

20   Exhibit 6      E-mail string "RE:  Najdat -
                    Update" dated 4/18/2012;
21                  1 page                            94

22

23

24   Witness Signature Page                          99

25   Reporter's Certificate Page                    100
```

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1           San Diego, California; Thursday, April 23, 2015
 2                         9:10 a.m.
 3                          -  -  -
 4           THE VIDEOGRAPHER:  Good morning.  This is the
 5   video recorded deposition of Steven Margolius.  Today's
 6   date is April 23rd, 2015.  The time is approximately 9:10
 7   a.m.  This deposition is being held at 4747 Executive
 8   Drive, Suite 1000, San Diego, California, 9210 -- 92121.
 9   Videographer is Scott Tanaka, here on behalf of Dallas
10   Video Concepts.  The court reporter -- would all present
11   please identify themselves for the record.
12           MR. LASLEY:  My name is Edward Lasley and I am
13   Amir Shaeigan's lawyer.
14           MR. HALEY:  My name is Ray Haley, and I
15   represent HD Supply and Najdat Haydar, the individual
16   defendant in this action.
17           THE WITNESS:  Good morning, my name is Steve
18   Margolius.  I'm with HD Supply.
19           THE VIDEOGRAPHER:  Court reporter, please swear
20   in the witness.
21                    STEVEN MARGOLIUS,
22      having been first duly sworn, testifies as follows:
23                       EXAMINATION
24   BY MR. LASLEY:
25      Q    Mr. Margolius, my name is Ted Lasley.  I
```

Steven Margolius - 4/23/2015

1    introduced myself when we first walked in.  Obviously I'm

2    here today to take your deposition in a lawsuit that I

3    filed on behalf of Amir Shaiegan against HD Supply and

4    Najdat Haydar.  Your name's come up a few times during

5    this case, so I'm here today to talk to you to find out

6    what you know about the situation.

7         A    Okay.

8         Q    Okay.  Have you ever given a deposition

9    before?

10        A    First time, Mr. Lasley.

11        Q    Okay.  So I'm going to go through a few ground

12   rules that Ray probably talked to you about.

13             As you see, we have a court reporter that's

14   typing all of this down.  It's difficult for her to type

15   down when we -- you and I talk over each other, so if you

16   would be kind enough to let me finish my question before

17   you try to answer it, I'll try to do the same and not ask

18   the second question until you've answered the first one.

19   Okay?

20        A    Agreed.

21        Q    Also, in general conversation, we all have a

22   habit of shaking our head, or saying "uh-huh" and

23   "huh-uh," things like that, and those are hard to take

24   down.  And when we go back and read this later, it could

25   be confusing.  So if you would just make it a point to

Steven Margolius - 4/23/2015

1   answer my questions verbally and not nod your head and

2   things like that so it's easier to read later.  Okay?

3       A    I will.

4       Q    At any point during this deposition, if you

5   need to take a break, get a drink of water, use the

6   restroom, talk to Mr. Haley, all of that's fine.  This is

7   a -- a fairly informal -- so if you want a break, just

8   ask me.

9       A    Okay.

10      Q    I'll be glad to give it to you.

11      A    Appreciate it.

12      Q    Finally, I have a habit at times of asking bad

13  questions.  It sounds perfect in my head, but maybe it

14  doesn't sound as perfect in yours.

15           If I ask you a question that confuses you at

16  all, please ask me to rephrase it, because when we go

17  back and read this later, we're going to assume that you

18  understood every question, and you gave your best,

19  truthful answer to it.  So make sure you understand them,

20  and ask me to rephrase it if you don't.  Okay?

21      A    I will.  Thank you.

22      Q    Give me your full name, please.

23      A    Steven Nathan Margolius.

24      Q    Is it 'V' Steven, or 'PH' Stephen?

25      A    It's with a 'V.'

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1      Q    What is your date of birth, Mr. Margolius?

 2      A    ████████████████

 3      Q    I'm a ███████.

 4      A    Wow.

 5      Q    I've got a partner who's the 17th.

 6      A    I'm sure you're a later year than me, though.

 7      Q    A little bit, a little bit.

 8           What's your address?

 9      A    My address is ██████████████████

10      ████████████████.

11      Q    Why are we in San Diego today if you're from

12      ████████?

13      A    My company has a business unit called HD Supply

14      Facilities and Maintenance, which is headquartered out in

15      San Diego.  I'm the chief administrative officer for that

16      business unit.  Our company headquarters are in Atlanta,

17      on Cumberland Boulevard in Atlanta, and my house is in

18      ████████, but I do a great deal of travel around the

19      country, and do spend a lot of time here in San Diego at

20      our headquarters.  Most of my team, the finance team and

21      others, are headquartered here.  So I'm out here quite a

22      bit.

23      Q    I'm going to go through some background stuff.

24      I'll be brief.

25      A    Okay.
```

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

Page 8

1    Q    So do this:  Give me just a nutshell of your

2  education?

3    A    Four years of high school education, high

4  school called Shenendehowa High in upstate New York,

5  Clifton Park, New York.  And then I've got a bachelor of

6  arts degree from the State University of New York at

7  Albany.  Graduated from high school in 1976 and graduated

8  from college in 1980.  And I've got some executive

9  education courses at some different universities around

10  the country, but my degree is from the State University

11  of New York.

12    Q    What did you say your degree was in?

13    A    I've got a B.A. in psychology.

14    THE REPORTER:  I'm sorry, could you slow down

15  just a little bit?

16    THE WITNESS:  It's the New York, I'm sorry.

17  Yeah, I will.  Yeah.

18    THE REPORTER:  Thank you.

19  BY MR. LASLEY:

20    Q    In 1980, when you got out of college, did you

21  go to work then?

22    A    I did.

23    Q    Where did you go to work?

24    A    First job was working for my father.

25    Q    What did your father do?

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1      A    My father owned a data processing company in

2    Albany, New York, and I worked for him as a computer

3    programmer.

4      Q    Walk me through your work history from then

5    till now.

6      A    Okay.  So I worked for my father until I was

7    about 29 years old.  And at that time, I joined General

8    Electric and became a computer programmer in their power

9    systems business in Schenectady, New York.  That was

10   probably about 1987.  1987.

11          I was a programmer for GE from '87 until '88.

12   And then I joined GE's corporate audit staff.  And I was

13   on the audit staff for about five years, and that was

14   basically doing corporate audit work at different GE

15   business units around the United States and in Europe and

16   in Canada.  So I did that for four and a half or five

17   years.

18          That was really like a fast-track training

19   program at GE.  So upon completion of that, I took a job

20   with GE Plastics in Spain, and I was the finance director

21   for the business unit in Spain for two years.

22          Doing okay on speed?

23          Finance director at GE Plastics in Spain for

24   two years and then re -- as an ex-pat.  Then repatriated

25   back to the United States in about 1992 and was the

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1   finance director for GE Plastics in Pittsfield,

 2   Massachusetts for several years.

 3           Then I transferred to New York to the sili- --

 4   GE silicones business.  I was a finance director of the

 5   silicones business for a few years and then transferred

 6   to Louisville and worked at Appliance Park, at GE

 7   Appliances, for about two or two and a half years.

 8           In 2001, I received an offer to leave GE, join

 9   a company headquartered on Long Island called Arrow

10   Electronics, an electronics distribution company.  I

11   worked for Arrow Electronics from 2001 until the

12   beginning of 2006.  I was vice president of finance and

13   also ran their distribution and logistics functions.

14           In 2006, I was offered a job with HD Supply in

15   Orlando as president of -- of -- of -- of a business unit

16   called HD Supply Electrical.  And so from 2006 through,

17   you know, currently -- well, there was -- there was a

18   break in there.

19           2006 until the beginning of 2010, I had various

20   leadership jobs at HD Supply, ran the electrical

21   business.  Then they merged our electrical and plumbing

22   businesses together, so I ran those two businesses.

23           Then I left for a year, moved to South Carolina

24   and worked for a company called United Sporting Company

25   as executive vice president and chief operating officer.
```

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1   They're based in Chapin, South Carolina.  Worked for them

2   from about March of 2010 to March of 2011.

3          Early 2011, I rejoined HD Supply in Atlanta

4   this time.  I had been in Orlando previously.  Joined HD

5   Supply in Atlanta, and my job was chief commercial

6   officer for HD Supply Inc. and also chief operating

7   officer for the utilities business -- HD Supply

8   utilities.

9          In 2012, we merged the old electrical business,

10  which I had been president of previously, with the

11  utilities business, and I became president of -- of that

12  new combined bigger business unit.  And then in 2013, I

13  was named CEO of -- of that unit of -- we called it Power

14  Solutions was the new name of HD Supply Power Solutions.

15  That was in 2013.

16          I worked in that business from that 2013 until

17  the end of January of 2015.  And then beginning in

18  February of this year, I became the chief administrative

19  officer of our facilities maintenance business, which is

20  the one I said is headquartered here in San Diego.

21      Q    Let me back up just a minute and ask you a few

22  things about before we got here today.

23          What did you do to prepare for this

24  deposition?

25      A    Well, going back to when I first found out that

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1    I was going to be deposed, I received a phone call from

2    Susan Stucker, who is one of the attorneys in HD

3    Supply.

4            MR. HALEY:  And I'm going to instruct you not

5    to talk about the conversation that you had with Susan.

6            THE WITNESS:  Okay.

7            MR. HALEY:  That's privileged.

8            THE WITNESS:  Okay.  She notified that I would

9    be asked to take a deposition.  She introduced me to Ray

10   and one of his colleagues.  They shared with me --

11           MR. HALEY:  Nope, nope, nope.  Don't answer

12   that.

13   BY MR. LASLEY:

14       Q    I'm not asking you what lawyers told you.

15       A    Okay.

16       Q    I'm just trying to figure out what -- who you

17   talked to, what documents you reviewed, things like that.

18   Okay?  I'm sure Ray --

19           MR. HALEY:  Other than the lawyers and what we

20   produced for you.

21   BY MR. LASLEY:

22       Q    I assumed that you talked to Susan.  I assumed

23   you talked to Ray, and probably Katherine Garbarino in

24   his office?

25       A    Yeah.

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1    Q    That's fine.  I don't want to know what y'all

2    talked about.

3         Did you speak to anyone else at HD Supply about

4    the fact that you were giving a deposition or what might

5    be discussed in that deposition?

6    A    No.

7    Q    Didn't talk to Najdat Haydar?

8    A    No.

9    Q    Did you review any documents prior to coming

10   here today to either refresh your memory or to learn

11   information that I might ask you?

12   A    I read Najdat's deposition.

13   Q    Okay.  Didn't look at any corporate documents,

14   any policies, procedures, e-mails, anything like that?

15   A    No.

16        Oh, can I just add to that?  I did tell my

17   manager that I needed to be here today.

18   Q    Okay.

19   A    And my assistant knows I'm here today.  That's

20   it.

21   Q    Okay.  In late 2011, early 2012, going back to

22   the time frame of when both Amir Shaiegan and Najdat

23   Haydar were terminated from HD Supply, okay?

24   A    Umm-hmm.

25   Q    What was your position at HD Supply at that

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

Steven Margolius - 4/23/2015

Page 14

```
 1   time?
 2       A    You said late 2011?
 3       Q    (Nods head.)
 4       A    So late 2011 is the period where I had two
 5   roles.  I was the chief commercial officer for HD Supply
 6   Incorporated, so, you know, over all the business units,
 7   and I was the chief operating officer for the unit at
 8   that time, which was called HD Supply Utilities.
 9       Q    Who did -- or what entity I guess did Najdat
10   Haydar work for at that time?
11       A    At that time, Najdat worked for HD Supply
12   Utilities.
13       Q    Did the two of y'all interact at all as part of
14   the business of HD Supply?
15       A    Najdat Haydar and myself, yes, we did.
16       Q    Okay.  Tell me what -- what -- where you both
17   fit into the chain --
18       A    Okay.
19       Q    -- at that time.
20       A    Okay.  So the way the hierarchy worked was
21   there was a -- a president of -- of the business.  I
22   was -- I was a direct report to the president.  His name
23   was Rick McClure.  I was also a direct report to the CEO
24   of the company.
25            So in my organization, one of the areas that I
```

**Steven Margolius - 4/23/2015**

1  was responsible for was -- was operations.  So, you know,

2  we had about a hundred-some distribution locations,

3  branch offices, that had inventory that supported utility

4  customers across the U.S. and Canada.

5         So from an operations standpoint, I was

6  responsible for that.  I was also responsible for our

7  purchasing and sourcing organizations.  And Najdat's job

8  at that time was the vice president of purchasing and

9  sourcing for us.

10     Q    Okay.  As the vice president of purchasing and

11  sourcing, what -- what were his job duties?

12     A    He had a couple of responsibilities.  One was

13  to create very strong relationships with our suppliers.

14  You know, we're a distributor, so we don't make anything.

15  We buy, we hold inventory in our warehouses, and we sell.

16         His job was to develop, maintain, and sustain

17  influential relationships with our suppliers really for

18  four reasons.  We wanted to get the best possible price

19  from the suppliers, best possible cost, best possible

20  people from the suppliers helping us resell, and the best

21  possible quality.  So those four areas chiefly were what

22  Najdat was responsible for doing.

23     Q    When did you first meet Najdat?

24     A    I rejoined the company in -- I knew who he was

25  because I had been in the company since 2006.  He had

Steven Margolius - 4/23/2015

1    worked in different -- a different part of the company

2    than I had worked in.

3              So I knew who he was.  I had seen him at some

4    global leadership meetings and things like that, but I

5    really didn't get to know him until I rejoined the

6    company in -- I guess it was the first week of April of

7    2011, when, you know, he was -- he was a direct report in

8    the organization that I was put into.

9        Q    Before then, y'all hadn't actually worked

10   together?

11       A    We had not worked together.  I knew that he was

12   from GE.  I -- you know, as I told you, I had been at GE

13   for a number years, but we had never worked together,

14   either in HD Supply or in General Electric.

15       Q    Did you work with Amir Shaiegan at any General

16   Electric?

17       A    No, I didn't know him there either.

18       Q    Okay.  Is there some connection between General

19   Electric and HD Supply?

20             Seems kind of odd that all three of you guys in

21   this case went from GE to HD Supply.  Is that some AAA

22   of --

23       A    Well, it's -- as you may have read, it's --

24   GE's known for, you know, being a good developer of -- of

25   leaders and people with core competencies in a lot of

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1   disciplines whether it's purchasing or finance or IT.

2           HD Supply was a company that was formed in the

3   mid 2000s by some people that did have GE backgrounds, so

4   they tended, when it came time to recruit, you know, to

5   open up Rolodexes and look at colleagues that we had been

6   in touch with in the past that -- that we knew and, you

7   know, we could call on to see if they wanted to come work

8   for us.

9       Q    When -- April of 2011, when Najdat Haydar

10  became a direct report to you, tell me about that when

11  y'all first started working together, what you knew about

12  him, how he worked, how good of a job he did, things like

13  that?

14      A    Well, I -- I -- I -- I -- I do have to tell you

15  that I'm going to do my best to answer all of your

16  questions.  You know, that for me was a long time ago.

17  It was almost four years ago.  So a lot of what I'll say

18  in answering this question is broad recollections from

19  that time.

20           So could you just repeat that question for me?

21      Q    Sure.  It's probably one of those bad questions

22  I warned you about.

23      A    No, that's all right.

24      Q    I'm just wanting to kind of get a feel for when

25  you came into this role in 2011, Najdat was reporting to

Steven Margolius - 4/23/2015

1   you, tell me what you knew about Najdat, his -- his work

2   performance, you know, what -- what interactions y'all

3   had and your -- your thoughts on that.

4        A    Yeah.  My knowledge of -- of Najdat, you know,

5   coming in, was that he is a very experienced purchasing

6   professional and worked very hard on, you know, I

7   mentioned the four aspects of what he was responsible

8   for.

9        Q    All right.

10       A    He was known for very -- being very strong at

11  working with suppliers to get the best possible price for

12  our company.

13       Q    Were there ever any issues between you and

14  Najdat where you weren't happy with his work

15  performance?

16       A    Of course.  There -- there -- there were issues

17  where he was late on deliverables, not -- not anything

18  unusual, you know, relative to other direct reports that

19  I had.  So I -- I would say that the -- there were

20  issues.  They were more along the lines of being late on

21  projects, late on things that -- that were -- that were

22  due to the organization.

23       Q    At that time, and let's just say in April 2011,

24  where were you actually working from?  Was it Atlanta?

25       A    Yeah, I was headquartered in Atlanta.

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
1        Q      And how about Najdat?

2        A      I think right when I joined, he was

3   transitioning from Atlanta to Orlando.

4        Q      How often would the two of you communicate?

5        A      Well, when he was still in Atlanta, I'd

6   probably see him once or twice a week in the building.

7   We were -- we were up on the same floor.

8               In fact, when he moved to Atlanta, I moved

9   across the hall into his office.  So I saw him briefly,

10  you know, in -- in -- in between the time that he

11  relocated and -- and moved down to Orlando.

12       Q      Once he moved to Orlando, how often would you

13  communicate then?

14       A      We had weekly one-on-ones by -- by telephone,

15  unless he happened to be up in Atlanta, or I was down in

16  Orlando.  But typically it was a, you know, standing

17  call.  It would be 30 minutes once a week where we would

18  each have a list of things that we wanted to go over with

19  each other.

20       Q      Okay.  Did you send e-mails back and forth?

21       A      Occasionally, yeah.  I mean, you know, similar

22  to, you know, regular -- regular business correspondence.

23       Q      Okay.  Whenever the times when Najdat may have

24  been late on delivering a project, did you ever send an

25  e-mail telling him you were unhappy with his work, or
```

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1   letting him know that he was late, or anything like
 2   that?
 3         A    No.  I've always been -- been -- I mean, I
 4   would send an e-mail checking on the status of things,
 5   saying, "Hey, could you give me an update," you know,
 6   from time to time.  But my -- my preferred communication
 7   path with my team is either to talk to them in person,
 8   walk down to the -- down the hall, if they're in my
 9   building, or pick up the phone.  And in his case, it
10   would have been picking up the phone.
11         Q    This is probably going to be another one of
12   those bad questions, but here is a source of concern for
13   me in this case.  Okay?
14              Within about a week in April of 2012, both Amir
15   Shaiegan and Najdat Haydar were terminated from HD
16   Supply.
17         A    Within?  Say that again?
18         Q    Within about a week --
19         A    Okay.
20         Q    -- the two of them were terminated.  I've
21   requested from HD Supply all correspondence, e-mails, or
22   anything where people at HD Supply were communicating
23   about problems with either one of their performance.
24   Okay?
25         A    (Nods head.)
```

Steven Margolius - 4/23/2015

1      Q   And I think I've been given one, maybe two

2  e-mails, and they say that's it.  And I, quite honestly,

3  find that very hard to believe; that two people making --

4  high up in the company as they were, both being

5  terminated, and there weren't e-mails exchanged between

6  either their direct supervisor, HR, or somebody.  Okay?

7          So I guess the question to follow with that:

8  Does HD Supply have any type of policy that would direct

9  the people to not send e-mails if you're being critical

10  of work performance of an employee?

11      A   No, we don't.

12      Q   In your experience, in the time that you've

13  worked at HD Supply, is it common to send e-mails to

14  anyone, whether it's the person you're unhappy with, or

15  HR anybody, when you have a problem with an employee's

16  performance?

17      A   I think it depends on the situation.  Like I

18  said, my -- my preferred method of communication is --

19  is -- is to talk to people and not pass around notes.

20  Because to me, it's very difficult to get into a lot of

21  detail in an e-mail.  I've always preferred to just pick

22  up the phone or walk down the hall.

23      Q   Is there any policy at HD Supply that you're

24  aware of, whether it comes from Human Resources or

25  anywhere else, that asks supervisors or direct reports to

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

Page 22

1  document issues when it comes to employee performance?

2      A    Is there -- is there a policy on that?

3          Not that I'm aware of.

4      Q    Okay.  Has anyone ever told you that it's a

5  good idea to document performance issues so that if there

6  ever is termination, that you'll have some sort of

7  documentation or proof of the person's poor

8  performance?

9      A    Yes.  In -- in -- and typically, you know, the

10  ultimate form of that documentation is in the annual

11  performance appraisal process that we have, which is

12  very -- a very detailed processing.  It gets into all

13  aspects of a person's, you know, job responsibilities

14  and -- and performance.  And all employees, whether

15  you're one of our drivers or, you know, a director or a

16  vice president, receive an annual performance appraisal.

17          Typically what happens for hourly workers or

18  people that are below the level of, say, senior manager,

19  you know, that would be a manager or an individual

20  contributor, they do get pretty -- pretty -- so for a guy

21  that works in our warehouse that has chronic tardiness,

22  there is a formal process, you know, to write -- to write

23  that up, or somebody that has chronic safety issues, you

24  know, that's written up.

25          But as far as, you know, the more senior people

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1   in the organization, what my observation -- what tends to
 2   happen is it's documented in annual performance appraisal
 3   processes, and then it's handled usually one-on-one with
 4   the manager and the associate.
 5        Q    Okay.  Would both Najdat Haydar and Amir
 6   Shaiegan fall into that senior level you're talking
 7   about?
 8        A    They are, yeah.  They are -- I believe Najdat
 9   was a senior manager or a director -- I mean, Amir was a
10   senior manager or director when he was in my
11   organization.  I know that Najdat was a VP.
12        Q    Let's talk a little bit about Najdat Haydar's
13   termination.
14             Who -- who made the determination to terminate
15   Najdat?
16        A    I did.
17        Q    Why?
18        A    Well, let me -- let me just think about --
19   think about that for a second, and then just go back in
20   time.
21             So in -- as I mentioned, in 2012, we -- we put
22   two organizations together.  But prior to that, we began
23   evolving the way we thought about sourcing, and the way
24   we thought about purchasing in our business, and we're
25   moving away from a model of this really aggressive
```

02974339-48db-493e-97d9-3513a233dea4

1    approach with suppliers; you know, just, you know, if the

2    supplier is charging us a dollar today for this bottle of

3    water, you absolutely only have to charge us 75 cents, or

4    we're going to switch to somebody else.  We had a very

5    strong mentality around how we work with suppliers and

6    how we managed the sourcing and the purchasing function.

7            As we, you know, got into 2011, and then, you

8    know, further on, we changed the sourcing and purchasing

9    concept from that to -- kind of disciplined in that kind

10   of approach to something that we call "category

11   management," and that was more along the lines of

12   assigning individuals to be responsible for certain

13   categories.  So somebody would be responsible for

14   transformers, let's say, and someone would be responsible

15   for wires, someone would be responsible for lighting.

16           And our expectation of them would be to develop

17   very influential relationships with suppliers,

18   partnering-type relationships with suppliers, and also

19   have the ability -- the senior people like Najdat, the

20   ability to not only work the supplier's side of the

21   equation, but also to be able to work with our customers,

22   because there's a very strong connection between

23   suppliers and our sales force and our customers.

24           And so relative to Najdat, you know, as I said

25   in the beginning when you asked me to describe him, he

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1    was outstanding at that, you know, "Let's go get better

2    price, better price, better price, more rebates, more

3    rebates, more rebates," but he didn't really have the

4    skill set we were looking for as far as being able to

5    work with the field, get the field -- being our sales

6    force and working with the suppliers on these influential

7    kind of relationships where we collaborate and try to

8    grow.

9         So -- so I made a decision that we needed to

10   evolve to a different type of leadership as we moved from

11   this category -- as we moved to this category and

12   management concept and, you know, Najdat didn't have

13   everything in his background and his skill set that would

14   make him and our organization successful in that new

15   mode.

16   Q    Was there ever any attempt on your behalf or HD

17   Supply's behalf to try to evolve Najdat to develop that

18   skill set that was needed?  Or was it just one day, "I

19   don't think he has it, we're going to terminate him"?

20   A    Is -- the answer -- could you say the question

21   again, please, so I can answer it properly.

22   Q    Sure.  I'm just trying to figure out if when --

23   I think what you've told me, and correct me if I'm wrong,

24   is that Najdat was terminated because of this basically

25   change in philosophy at HD Supply on how you were going

CERTIFIED COURT REPORTERS AND VIDEO, LLC
(855) 227-8552

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1    to deal with not only suppliers, but potentially the

2    sales force and customers?

3         A    That's right.

4         Q    And Najdat's skill set was that of the old way

5    that y'all did it, and wasn't so much the new way.

6             What I'm trying to figure out, did y'all try to

7    develop his skill set so that he was able to do it the

8    new way, or did you just make up the mind -- your mind

9    that he -- he wasn't fixable?

10         A    No.  My -- my point of view on that was that he

11    was -- he was a pro -- a consummate pro at the skill set

12    that was very successful in the older era in HD Supply.

13    And as I talked to him about the direction that we're

14    going to be moving in and the kind of things that -- that

15    needed to be done, it became clear to both of us and --

16    and I know that he understood what I was saying -- that

17    we needed to move in a different direction and have a

18    leader in there that had a different set of experiences,

19    and also a different set of relationships with

20    customers.

21         Q    At any point -- well, back up.

22             At what point did HD Supply start transitioning

23    from the old way to the new way?  And I'm talking about

24    time.  Was it in 2011, early 2012?

25         A    Boy, I -- I know -- I'm just trying to figure

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1  out the timeline.  So in 2012, we merged organizations

2  together in September of 2012.  I remember that date

3  because we had a big kick-off meeting where we had all

4  the -- all the business people come in.  But it was -- it

5  was sometime in the -- you know, I would say 2011 to mid

6  2012 time period that -- that we had been working -- that

7  I had been working on the strategy for that.

8       Q    Okay.  As far as you know, was there any

9  communication with Najdat, written communication, be it

10  e-mail or letters, about the transition and the way that

11  HD Supply was evolving, going with suppliers and

12  customers?

13      A    No.  The -- as far as I know, I didn't write an

14  e-mail about that, and that would not have been my

15  approach.  It would be to sit down with him and

16  explain -- explain the strategy in detail and answer any

17  questions that he had, and -- and really explain to him

18  with full transparency what we were trying to accomplish.

19  I -- it would have been too difficult for me to write an

20  e-mail and express all of that.

21      Q    How many e-mails do you typically send and

22  receive on a day?

23      A    It depends on the day, and it also depends on

24  the time of the month and quarter.  I'm very heavy at the

25  end of each month and the beginning of each month.  End

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1    of the end of each month because we're getting ready to

2    close the books, want to sell everything that we can, so

3    there is a lot of interactions with people, just checking

4    on, "Where are we with the numbers?  What are our

5    margins?  What are our sales?"  Then when we close the

6    books, a lot of back and forth with the finance team and

7    the sales team going over the results.

8            So it does vary.  But typically, I could get

9    anywhere from 30 to 60 or 70 business e-mails a day, and

10   probably, you know, a number of phone calls as well.  You

11   know, it ranges.

12       Q    Sure.

13       A    I could get 30 -- I know when I go back to my

14   office today, I'll probably have 90 e-mails.

15       Q    Know the feeling.

16       A    It's the end of the month.

17       Q    I know the feeling.

18            Was there any particular circumstance that led

19   to Najdat's termination?  Was there a fight?  Was there a

20   particular thing he did wrong?  Or was it truly just this

21   whole transitioning thing that you decided his skill set

22   wasn't --

23       A    Yeah, it was the fact that we were evolving in

24   our approach in getting into this category of management

25   approach, which had been very successful in other parts

Steven Margolius - 4/23/2015

1    of the company.

2        Q    And what I'm getting at is I spoke to -- I

3    believe it was Cindy Cheskco in a deposition, and she

4    told me that Najdat was terminated after a disagreement

5    and a heated conversation with you.

6            Is there any truth to that?

7        A    A disagreement and a heated conversation with

8    me?

9        Q    And that led to Najdat's termination?

10       A    Not true.

11       Q    Okay.

12       A    Now, she may -- that may be her -- her opinion,

13   but I don't remember ever having -- he's a gentleman.   I

14   never had a heated discussion with him.

15       Q    Okay.  Was Najdat ever placed upon or offered

16   any sort of performance improvement plan before he was

17   terminated?

18       A    Not from -- not from me.  So at that point in

19   time, no.  It wouldn't -- wouldn't have been from anybody

20   if it wasn't from me.  So the answer is no.

21       Q    Okay.  Najdat told me in his deposition that on

22   April 10th of 2012, you gave him his annual review, and

23   he indicated that you went over a performance plan with

24   him at that point.

25            Do you recall that?

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1        A    I don't recall that, but -- but I -- but I will
 2   tell you that in his annual performance review, I would
 3   have told him that he needs to focus on, you know, the
 4   following areas for improvement, and I would have
 5   emphasized the things that he had done that were quite
 6   effective.
 7        Q    Okay.
 8        A    But I -- but I -- to answer your question, I
 9   don't recall putting him on a performance improvement
10   plan.
11        Q    Okay.  And what I'm trying to -- to find out,
12   and I'll try to cut to the chase, what Haydar told me
13   that on 4/10 of 2012, the two of you met for his annual
14   review and you went over a performance plan,
15   insufficient -- inefficiencies in his work, and that the
16   two of you had a disagreement.  Then on the 13th, which
17   was three days later, he went to you and said he agreed
18   with your plan, but you said, "No, it's not going to
19   work," and terminated him that day.
20             So it sounds like something happened in a
21   three-day period, based upon Najdat's testimony, and I'm
22   trying to figure out what you remember about that, versus
23   what he recalls.
24        A    Sure.
25             Could -- could you repeat those facts for me,
```

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1    please?

2         Q    Sure.   The -- and, again, this is Najdat's

3    testimony.

4         A    Sure.

5         Q    I didn't watch a movie and get this off the --

6         A    No, no, I understand.

7              April 10th, you gave him his annual review,

8    April 10th of 2012, and the two of you went over a

9    performance plan and had a disagreement.   And then on

10   April 13th, he indicated his agreement to your plan, but

11   you presented him with a separation agreement instead

12   saying that you didn't think that even with the

13   performance plan, it was going to work out.

14             Okay.   Do you recall that set of facts?

15        A    I don't.

16        Q    Are you saying that's not correct, or you don't

17   remember?

18        A    I'm saying I don't remember.   I remember having

19   his performance appraisal.   I remember sitting down with

20   him, having the termination discussion, but I don't -- I

21   don't remember any events that transpired between the

22   dates.

23        Q    Okay.   At any point in time when you were

24   discussing Najdat Haydar's performance with him, did Amir

25   Shaiegan or his performance, or anything about Amir come

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

Page 32

```
 1   into your assessment of Najdat?

 2        A    Could you repeat that, please?

 3        Q    Sure.

 4             When you we're evaluating Najdat Haydar's

 5   performance and discussing that with him, did Amir

 6   Shaiegan, whether his work performance or any complaints

 7   he might have made or anything about him, play any role

 8   in your discussions or your concerns about Najdat's

 9   performance?

10        A    Well, the answer to that is yes.  So when I

11   assessed Najdat performance, it's his performance as a

12   leader of the organization, and it's also I hold him

13   accountable for the performance of the people in his

14   organization.

15             So when I, you know, speak with any leader,

16   including Najdat, about their performance, it is also a

17   reflection on, you know, the strengths and the weaknesses

18   of the people that he is responsible for leading.

19        Q    Okay.  Do you recall any specifics, any

20   specific criticisms, relating to Amir that were discussed

21   with Najdat?

22        A    In Najdat's performance appraisal?

23        Q    At any point, whether it was just in passing

24   conversation or in the performance appraisal?

25        A    Could you repeat the first part of that again?
```

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1    Q    Sure.

2        I just want to know if you recall any specifics

3    relating to Amir Shaiegan's performance that wasn't

4    discussed with Najdat Haydar?

5    A    Yes.

6    Q    Okay.  Tell me about that, what you recall.

7    A    So -- so as I mentioned to you earlier in the

8    discussion, we -- we talked -- you know, I talked to you

9    about the weekly updates that I have with my team.

10        So, you know, one topic that was frequently on

11    the radar screen when we had those discussions was

12    questions from me toward Najdat, "Where are we on, you

13    know, Program A, Program C, Program D in Amir's part of

14    the organization?"  And that was -- that continued to be

15    a point of -- of -- of weakness and poor performance and

16    not meeting expectations.

17        So -- so to answer your question, Amir was a

18    relatively frequent area of the business that we talked

19    about in terms of poor performance and not meeting

20    expectations.

21    Q    Okay.  You -- we're talking about Project A,

22    Project B.

23        Do you have any specific recollection of any

24    specific projects that Amir performed poorly on and that

25    was discussed either between you and Najdat or Najdat and

02974339-48db-493e-97d9-3513a233dea4

1    Amir?

2      A    I don't know the names of the specific

3    projects, but I can -- I can tell you in -- if you're

4    interested in general, what those areas would have

5    been.

6      Q    Okay.

7      A    Okay.  So Amir was assigned to a specific

8    number of product categories, you know, in this area,

9    including something called proprietary brands, where

10   we're trying to -- you know, instead of selling Crystal

11   Geyser water, we'd put our own label on it.  And so we

12   wanted to do that with a lot of products.  So he was

13   responsible for expansion of our proprietary brands

14   program.

15            And I remember that, you know, Najdat saying

16   that, you know, "We were late.  We were delayed.  We were

17   not getting enough proprietary brand stuff done fast

18   enough.

19            He was also responsible for relationships with

20   a certain number of suppliers where we're trying to

21   execute programs with those suppliers to get lower costs

22   and better delivery and higher quality.

23            And I remember in discussions with Najdat

24   saying, you know, "Where are we with Amir and these

25   programs?"  And the general impression I had over an

Steven Margolius - 4/23/2015

1  extended period of time was that we were late.  We were

2  behind schedule.

3       And then when I repeatedly, you know, asked

4  Najdat why, why, why, you know, began to get a picture

5  that Najdat -- that Amir, you know, was not being

6  responsive to Najdat's requests.  He wasn't meeting

7  Najdat's deadlines.  He wasn't returning Najdat's phone

8  calls, you know, sometimes for days at a time, not

9  returning Najdat's e-mails and really just falling down

10  on his responsibility.  So, you know, that was a long

11  answer, and I apologize for that.

12       Q    That's fine.

13       A    But generally speaking, Najdat and I did talk

14  about Amir's performance and -- and -- you know, as well

15  as the performance of other individuals that were direct

16  reports to -- to Najdat.

17       Q    Okay.  Were there other direct reports to

18  Najdat that y'all discussed that were having performance

19  issues other than Amir?

20       A    Well, Najdat does have -- did have other --

21  other direct reports, and we talked about, you know, on

22  our calls, each -- each person what's going well, what's

23  falling behind, what do -- what do we need to do.

24       Q    Who else do you recall having discussed poor

25  performance?

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
1        A     Poor performance?

2        Q     Yeah.

3        A     Well, it wouldn't necessary -- I mean, I can

4   tell you the names of the people that worked for Najdat.

5   I don't remember, you know, at that point in time, who

6   was on the -- kind of on the radar screen for being -- I

7   don't think any were what I would characterize as poor

8   performers.  There are areas where they needed to become

9   stronger, but I don't have a list of guys in mind that

10  would have been poor -- poor performers.

11       Q     Would Amir be considered a poor performer?

12       A     Yes.

13       Q     What I'm trying to figure out of -- how many

14  direct reports did Najdat have?

15       A     You know, it changed over time.  I would

16  probably say on average, maybe six -- maybe six or so

17  direct reports.  You know, we had consolidated some of

18  the positions, you know, the work of two people over time

19  sometimes were consolidated into one.  In other cases,

20  you know, we were hiring new people.  So an estimate --

21  and this would just be an estimate and not a fact -- I

22  would say probably -- probably six -- six or seven.

23       Q     Okay.  In the spring of 2012, Amir was

24  terminated.

25             Were any of Najdat's other direct reports
```

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1    terminated at or around that time?

2        A    Not that I recall.

3        Q    Okay.

4        A    But, you know, just to be clear, there may have

5    been.  I don't -- I don't -- I don't remember if there

6    were or who they were.

7        Q    Who would know that?

8        A    You would probably be able to contact someone

9    in Human Resources.  You know, Cindy's no longer with the

10   business.  There was a vice president of Human Resources

11   named Rob Joseph.  But between Cindy's old records and

12   Rob Joseph's old records, it would be in those records.

13       Q    What period of time -- how long of a time do

14   you think you and Najdat continued to have conversations

15   about Amir's performance?

16            I think you said that it was regularly

17   discussed on your weekly one-on-ones?

18       A    Umm-hmm.

19       Q    Over what period of time was that regularly

20   discussed?

21       A    Well, it was certainly discussed right up until

22   the end, but I don't know -- I don't know the date that

23   they started.

24       Q    Ballpark it?  A year?  Six months?  A month?

25       A    Well, I'm just trying to think back to when

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1    I -- when I -- when I took that roll.

 2            So I came into that roll April of 2011.  So it

 3    was -- you know, it was probably pretty close -- pretty

 4    close to the beginning.

 5            So, you know, I would -- I would say certainly

 6    most of Amir's final year, it was a topic discussion.

 7    And I know that it was before we headed into the -- into

 8    the holidays the previous year, as I started thinking

 9    about the organization and how we wanted to get into

10    category management and that type of stuff.  So it was --

11    it was an ongoing -- it was a long-term, ongoing problem

12    with his performance.

13        Q    Did you and Najdat ever communicate via

14    e-mail?

15        A    Yes, we did.

16        Q    Okay.  Do you recall whether there was ever any

17    written communication between you and Najdat, whether it

18    was a letter or an e-mail, that discussed Amir Shaiegan's

19    performance?

20        A    Well, I've -- I've read one, so I -- I -- I --

21    I know that there was one.

22        Q    Okay.  What was that one?

23        A    The one that I saw was something that I saw

24    from counsel that --

25            MR. HALEY:  Don't say "from counsel."
```

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
1              THE WITNESS:  Okay.
2    BY MR. LASLEY:
3         Q    Let me do this -- let me try to make this easy.
4         A    Okay.
5              MR. LASLEY:  Do you have exhibit stickers?
6              THE REPORTER:  Just these (indicating).  And
7    then I can put the permanent ones on.
8              MR. LASLEY:  Okay.  That's fine.
9    BY MR. LASLEY:
10        Q    Okay.  I'm going to hand you what I have marked
11   with a pretty pink sticky note, what is --
12             MR. HALEY:  Thank you.
13             MR. LASLEY:  -- marked Exhibit 1.
14             (Exhibit 1 was marked for identification.)
15             THE WITNESS:  Okay.  So this is a --
16   from Najdat to me March -- March 27th, 2012.  Excuse me.
17             So your question is?
18   BY MR. LASLEY:
19        Q    Is that the e-mail that you were just talking
20   about that you had seen?
21        A    Yes.
22        Q    Okay.  Do you know if there were any other
23   written communications between you and Najdat regarding
24   Amir and his performance?
25        A    I don't.
```

CERTIFIED COURT REPORTERS AND VIDEO, LLC
(855) 227-8552

Steven Margolius - 4/23/2015

Page 40

```
 1        Q     Okay.  You don't know?  Or you know there are
 2   not?
 3        A     I don't remember any other e-mails.
 4        Q     Okay.  Okay.  And what's the date on that
 5   e-mail?
 6        A     This one is Tuesday, March 27th, 2012.
 7        Q     And I think your testimony has been that at
 8   least before the holidays, so at least three, four months
 9   prior you and Najdat had been having regular discussions
10   about Amir's poor performance.
11              Correct?
12        A     I believe so, yes.
13        Q     Okay.  And as far as we know, the only e-mail
14   that was ever traded between the two of you was in
15   March 27 of 2012?
16        A     Well, this --
17        Q     Relating to Amir?
18        A     -- this is the only one that I've seen.  You
19   know -- you know, as I said earlier, most of my
20   conversations with everybody is -- is verbally, you know,
21   on the telephone, or walking down the hall and speaking
22   with them.
23        Q     At any point were you ever notified that there
24   was a litigation hold or a legal hold being placed upon
25   documents at home -- at HD Supply relating to Amir
```

Steven Margolius - 4/23/2015

1  Shaiegan?

2       A    No.

3       Q    No one ever told you, "Save e-mails, save

4  documents, don't throw anything away related to Amir

5  Shaiegan"?

6       A    No.

7       Q    Okay.  Were you ever asked to do a search of

8  your past e-mails to find anything relating to Amir

9  Shaiegan?

10      A    No.

11      Q    Could you still do that?

12      A    Could I still do a search?

13      Q    Yeah.

14      A    I couldn't do one.  The IT people probably

15  could do one.  The reason I don't -- I don't -- why I

16  couldn't do them, is the only thing that are on my

17  computer is the -- you know, the business stuff that I'm

18  working on today.  I don't have a -- you know, an archive

19  of e-mails from that business from that -- that point in

20  time.

21      Q    What is the policy, as far as you know, when --

22  if I were to send you an e-mail today and ask you about

23  buying light bulbs from India or something, how long

24  would that e-mail be accessible to you?

25      A    To me?

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

Page 42

1      Q     Yeah.

2      A     I guess -- I guess it could sit in my inbox

3   forever, unless I deleted it, and then there is a

4   separate record retention policy around financial records

5   of the company.

6      Q     Okay.

7      A     But I don't know -- I don't know of a policy on

8   e-mails, or how the IT system works as far as storing

9   them and all that.

10     Q     What's your personal policy or preference or

11  whatever we want to call it as far as keeping e-mails in

12  your inbox after you read them?  Do you delete them

13  immediately?  Do you save some of them if you think it

14  might be of importance later or what?

15     A     All of the above.

16     Q     You've never looked to see if there were any

17  e-mails, in your inbox at least, relating to Amir

18  Shaiegan after this lawsuit was filed?

19     A     I did not.

20     Q     Okay.  I think you told me it was ultimately

21  your decision to terminate Najdat, that -- did that have

22  to be communicated to anyone else, bounced off anyone

23  else, get anyone else's approval?  Or is it you're just

24  the -- ultimately it was your decision, you made your

25  mind up, and did it?

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1        A    No, I made the decision, and it would have been
 2   my responsibility to talk about it with my manager, who
 3   was a guy named Rick McClure.  At the time, he was the
 4   business president, I was the chief operating officer,
 5   so --
 6             And that's -- you know, in that situation,
 7   since Najdat was a direct report, I would have talked
 8   that over with Rick and said, "For the following
 9   reasons," received his concurrence, and then done it.
10        Q    Okay.  As far as you know, was there ever any
11   written communications, either letters, e-mails or
12   whatever, between you and Rick McClure relating to Najdat
13   Haydar and your thoughts on why he should be
14   terminated?
15        A    I don't -- I don't remember.
16        Q    Okay.  Did you ever discuss Amir Shaiegan with
17   Rick McClure?
18        A    I -- I most likely did, yeah.
19        Q    Why do you say you most likely did?
20        A    Because he was a very poor performer in our
21   organization at a -- at a director level, so, you know,
22   as I discussed Najdat's performance with Rick, I would
23   have also discussed Amir's performance with him.
24        Q    Okay.  Let me ask you this -- and this is again
25   run the risk of asking these bad questions -- you worked
```

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

Steven Margolius - 4/23/2015

1    at a lot of places at fairly high levels as we went

2    through your work performance?

3        A    Yes.

4        Q    Does it seem odd to you that we're talking

5    about a guy who worked for a year or so, and has been

6    called a very poor performer, and looking at his file,

7    there's absolutely no documentation whatsoever of his

8    poor performance, other than one e-mail?  Does that seem

9    odd to you?

10        A    It does not seem odd to me.

11        Q    Okay.  In all of the places you've worked, have

12    there been some sort of policies or just practice that

13    when you have a person that's not performing up to par,

14    that you document it so that if we ever end up in any

15    type of fight or litigation over it, we will be able to

16    document that he performed poorly, other than us just

17    saying it?

18        A    Yes.  My expectation would be that that would

19    be in the performance appraisals, and it should be in

20    verbal conversations between the manager of that

21·   associate and -- and -- and the manager of that manager.

22            So in this case, if Najdat had an employee that

23    had, you know, poor performance, that -- that would be a

24    verbal discussion between and Najdat, and I would expect

25    that Najdat would be having regular communications with

Steven Margolius - 4/23/2015

1    that employee about that topic.

2        Q    Okay.

3        A    But -- but the real document where this kind of

4    performance issue is -- is -- is captured is -- is

5    typically in the annual performance appraisal.

6        Q    When are the performance appraisals done?

7        A    In HD Supply, the calendar, I think it -- I

8    think it begins -- and I may be off by a few weeks or

9    even a month -- but typically in January, all of our --

10   all of our employees do a self-appraisal.  And then in --

11   within a month or so of that, the managers are

12   responsible for writing an appraisal of that associate.

13   And then approximately, you know, a few weeks or a month

14   later, there is a process where managers review those

15   performance appraisals with the associate.

16       Q    So --

17       A    But I could be off -- I do want to say that the

18   dates change and the months change each year, but it's

19   generally the very -- very early part of the year that

20   that process happens.

21       Q    So Amir Shaiegan was terminated in the second

22   week in April.

23            Should a performance appraisal have been

24   completed before that point?

25       A    Second week of April?  It's pretty -- pretty

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

Page 46

1    close to that timing.  You know, as I said, the Human

2    Resource calendars vary from year to year.  Usually what

3    we try to do is to get those performance appraisals done

4    before the bonus checks come out.  So it's kind of a --

5    you know, a nice discussion with an employee, "Hey, you

6    did a great job.  Here's your bonus, and this is your

7    strengths and weaknesses."  And the opposite case as

8    well.

9              So it's typically timed to be before bonuses.

10    And then our bonus process in the company, as far as

11    issuance of bonus of checks, has ranged from checks being

12    issued in March to checks being issued in April.  I think

13    that's varied a little bit over the years.

14        Q    Let's talk about the bonuses for a second.

15        A    Sure.

16        Q    Does a person's performance as an employee at

17    HD Supply have an effect on whether they receive a bonus

18    or how much of a bonus they receive?

19        A    Well, this is a -- could you say that again?

20        Q    Does a person's performance affect; No. 1,

21    whether they receive a bonus; and No. 2, how much of a

22    bonus they receive?

23        A    Yes.

24        Q    Okay.  The -- do poor performers at HD Supply

25    get bonuses typically?

Steven Margolius - 4/23/2015

1    A    They can.

2    Q    Okay.  Explain that to me, when can they --

3    A    Okay.  So would it be acceptable to you if I --

4    if I told you what the overall bonus structure is and how

5    that works?

6    Q    That's great.

7    A    Because my answer will fit in with that.

8    Q    Okay.

9    A    There is a group of employees that are on

10    what's called MIP, M-I-P -- it stands for the Management

11    Incentive Program -- and those are typically managers,

12    senior managers directors, vice presidents, and business

13    presidents, all of us -- you know, anyone really with

14    a -- in a leadership position in the business is eligible

15    for management incentive bonus, a MIP bonus.

16        The way a MIP bonus works is it starts with the

17    EBITDA performance of the business, earnings before

18    income tax, deprec- -- basically the income.  It's based

19    on the income.

20        So each business unit has a target.  So let's

21    say our target, you know, in a given year was $80

22    million.  If the business hit the $80 million operating

23    plan number, anyone that was in that MIP program is

24    eligible to receive their MIP -- their full MIP,

25    regardless of whether they're a good performer, a poor

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1   performer, or a great performer.

 2              So -- but just to finish up that question, so

 3   everyone has a target bonus percentage.  Some people are,

 4   their bonus is 20 percent of their base, some 30, some

 5   higher, depending on your level, so if you're, let's say,

 6   a person with a 20 percent bonus target, and the

 7   business -- and you're making $100,000, your target bonus

 8   is 20,000, business hits the target, you get your target.

 9   If the business underperforms, your -- your 20 percent

10   goes down also.  So if the business overperforms, you

11   know, you can make more than your target.  If it

12   underperforms, you get less than your target, and it's a

13   mathematical calculation.

14              To answer your question about poor performers,

15   does poor performance -- I think -- did you ask if poor

16   performance impacts your bonus?

17       Q    Sure.

18       A    So the way that it indirectly impacts your

19   bonus is if your performance drags, if you're in a role

20   that can drag down the performance of the business, then,

21   you know, just by the nature of the mathematical

22   calculation, your performance and everybody else's would

23   be dragged down.

24       Q    Okay.  So I guess to ask that question another

25   way:  Does the fact that an employee or manager receives
```

CERTIFIED COURT REPORTERS AND VIDEO, LLC
(855) 227-8552

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

Page 49

```
1    a bonus, you know, a full bonus, is that indicative that
2    they were a good employee or doing a good job or not?
3         A    No.  And the reason is, is that that bonus is a
4    mathematical calculation.
5         Q    Okay.  Let me hand you what I've marked as
6    Exhibit 2.
7              MR. HALEY:  Thanks.
8              MR. LASLEY:  I handed you two of them, right.
9              MR. HALEY:  Oh, well, I'll give one back.
10             (Exhibit 2 was marked for identification.)
11             THE WITNESS:  Okay.
12   BY MR. LASLEY:
13        Q    First of all, have you ever seen that
14   document?
15        A    I have not.
16        Q    Okay.  What this is -- appears to me to be is
17   an e-mail from Najdat Haydar to Amir Shaiegan
18   congratulating Amir on a terrific bonus pay-out on 2011.
19             Is that right?
20        A    That's right.
21        Q    Does that sound to you like a manager that is
22   disappointed in his employee's performance, the way that
23   e-mail is written?
24             MR HALEY:  I'm going to object to form, but go
25   ahead and answer.  This is discovery.
```

Steven Margolius - 4/23/2015

```
 1            THE WITNESS:  Yeah, Mr. Lasley, I would say
 2    that because the -- you know, "if this were terrific"
 3    means that the business achieved its goals and this
 4    employee got his full bonus pay-out, and he wasn't
 5    penalized because of the company performing poorly.
 6            This would be a standard congratulation message
 7    based on the performance of the business.  This --
 8    this -- reading this, and knowing how our bonus program
 9    works, would have nothing to do with whether an employee
10    had outstanding personal performance or very weak
11    personal performance.
12    BY MR. LASLEY:
13        Q    Do you recall at what point you and Najdat
14    began discussing the possibility of terminating Amir?
15        A    I don't -- I don't remember the exact date,
16    no.
17        Q    Okay.  Can you ballpark it based upon when he
18    was terminated?  Had you been talking about termination
19    for months, days, weeks?  Because he was terminated the
20    second week in the April.  I'm just trying to figure
21    whether y'all were mulling over the possibility of
22    termination back before Christmas, or did it just happen
23    all of the sudden, we've got to pull the plug?
24        A    I don't know the answer.  I don't know when we
25    would have started talking about that aspect of it.  I do
```

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1    know that he had been a performance issue for an extended

2    period of time, probably going back into the third

3    quarter of the previous year, and my impression was that

4    it continued to worsen.

5          Q    I have not seen a performance appraisal of Amir

6    for 2011.

7               As you sit here, do you know if that document

8    exists?

9          A    It must.  It must be in the system.

10         Q    Okay.  How are those documents stored?

11    Electronically?

12         A    Yeah, the company has a software system.  I

13    think at that time, it was something called Peoplesoft,

14    or it was another one of these Oracle or one of those

15    packages.

16         Q    Sure.

17         A    But they're typically stored in that system.

18         Q    Okay.  Any idea how long they're stored?

19         A    I don't.  I don't know the retention policy for

20    them, no.

21         Q    Okay.

22              MR. HALEY:  I want to ask you -- excuse me a

23    moment, can we take a break?  Too much coffee.

24              MR. LASLEY:  Sure.

25              THE VIDEOGRAPHER:  We're going off the record.

CERTIFIED COURT REPORTERS AND VIDEO, LLC
(855) 227-8552

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

Page 52

```
 1    The time is 10:12 a.m.

 2              (Recess taken.)

 3              THE VIDEOGRAPHER:  Back on the record.  The

 4    time is 10:25 a.m.

 5    BY MR. LASLEY:

 6        Q    Mr. Margolius, right before we took a break, we

 7    were discussing Amir Shaiegan and whether or not there

 8    was a performance appraisal that was generated for him in

 9    2011.  Let me move on from there.

10              Who made the decision to terminate Amir

11    Shaiegan's employment at HD Supply?

12        A    I would -- I would characterize that as a joint

13    discussion between Najdat and me.

14        Q    Did anything -- well, was there a straw that

15    ultimately broke the camel's back that led to his

16    termination, or was it just it had been going on long

17    enough and the plug had to be pulled?

18              Yeah, my view was it was a compounding effect,

19    where he, you know, continued to not be accessible,

20    his -- his part of our business unit wasn't meeting their

21    deliverables, and it was getting worse rather than

22    better.

23              So I don't remember a catalyzing event, you

24    know, such as him showing up at a presentation

25    unprepared, and someone said that was it.  It was -- you
```

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1  know, I would just go back to the things that I said

2  were -- you know, when you asked me what were the

3  responsibilities of Najdat in the group, you know,

4  driving those vendor relationships, building up the

5  network, getting better cost and rebate positions for us,

6  and executing projects.

7        You know, we were falling further and further

8  behind, and the fact that he was not responsive in not

9  returning phone calls or e-mails when we wanted to speak

10 with him about things, it just cascaded into a situation

11 that was intolerable for the company.

12    Q    I may have asked this, forgive me if I did, but

13 did Amir's performance or poor performance have any

14 effect on Najdat being terminated?

15    A    No.

16    Q    Okay.  And just to be clear, Najdat was not

17 terminated because of the poor performance of his -- him

18 and his subordinates; it was because of this changing of

19 philosophies dealing with suppliers and customers?

20    A    That's correct.

21    Q    Okay.  And Amir, I think what you're telling

22 me, he was terminated just because of continued poor

23 performance in his job duties?

24    A    Continued poor performance over an extended

25 period of time in his job duties, yes.

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

Page 54

1       Q     Okay.  You said that you had weekly one-on-ones

2   with Najdat.

3             Did you have similar one-on-ones with Amir

4   Shaiegan?

5       A     Very infrequently.  You know, my practice

6   was -- was to do it with my direct reports.  And even to

7   this day, you know, maybe once or twice a year, I'll have

8   one-on-ones with the people that work for my direct

9   reports.  But typically I -- you know, I don't like to

10  meddle.  I don't like to micro manage.  And, you know, I

11  keep those one-on-ones between myself and my direct

12  reports.

13      Q     Okay.  To your knowledge, did Najdat have

14  similar one-on-ones, either weekly or regularly at least,

15  with his direct reports?

16      A     I'm not positive, but I believe that he did.

17      Q     Okay.  At any time prior to March 27th of 2012,

18  did anyone give Amir a list of things he was doing poorly

19  and an idea of what he needed to improve on?

20      A     Say that again, please.  Prior to --

21      Q     Prior to -- if you look in front of you, you've

22  got -- and what's marked as D88 I think at the bottom,

23  was attached to D87?

24      A     Yeah.

25      Q     So you've got Exhibit 2 --

Steven Margolius - 4/23/2015

Page 55

1     A     Yes, I see it.

2     Q     -- or that's Page 2?

3     A     Yeah.

4     Q     That was attached to an e-mail from Najdat to

5   you, which was March 27, 2012.  So at least by then, we

6   know that a list was put together basically saying what

7   Najdat -- or what Amir wasn't doing well, and what he

8   needed to do to improve.

9           Fair enough?

10    A     Would you -- would you say that again, please?

11    Q     Sure.

12          We know that as of March 27, 2012, there was a

13  list that was generated by someone --

14    A     Right.

15    Q     -- that listed all of Amir's inefficiencies,

16  wrongdoings, and then a list of things he needed to do to

17  improve that performance.

18          That's fair, isn't it?

19    A     Yeah.

20    Q     Okay.

21    A     It's in this document, yes.

22    Q     To your knowledge, was there ever a list

23  generated prior to March of 2012 that told Amir what he

24  was doing wrong and what he needed to do to improve?

25    A     I never saw such a list.

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

1       Q    Okay.  As part of your management, if someone

2   continually performing poorly over a period of time,

3   wouldn't it make sense to give them such a list to try to

4   improve their performance?

5       A    It would definitely make sense to make sure

6   that there was an ongoing discussion with that person,

7   you know, whether the manager generates a list and, you

8   know -- I mean, how they -- how they manage that

9   discussion, I think that probably varies from manager to

10  manager, but it's -- it's absolutely true that a manager

11  would communicate, "Hey, you know, these are the

12  expectations.  These are the areas where you're

13  performing well.  These are the areas where you have

14  shortcomings.  And here's what you need to do to boost it

15  up."

16      Q   Let's talk about your personal style.

17       Do you generally -- when you have an employee

18  that's not performing as well as you think they should,

19  do you typically generate a written list of their

20  shortcomings and how they can improve them?

21      A   I sit down with them.  I would -- I would sit

22  down across the table from you and say, "Look, as we've

23  discussed previously, these are the objectives for your

24  part of the business.  These are the things that you're

25  not getting done.  I need to see you step up your

Steven Margolius - 4/23/2015

1    performance.  And I'd like to see you generate for

2    yourself a road map, a timeline of -- for each thing that

3    you're responsible for.  When are you going to get it

4    done, and what help do you need?"

5        Q    Okay.

6        A    But I typically don't issue, you know, a

7    memorandum or materials like that.

8        Q    Okay.  Have you ever?

9        A    Have I -- have I -- could you repeat the

10   question for --

11       Q    Have you ever generated a -- a -- a list to

12   give to an employee that, "This is what you're not doing

13   well, and this is what you need to do to improve it"?

14       A    I may have.  I couldn't give you a specific

15   example.

16       Q    As you sit here now, you don't remember any

17   specific examples?

18       A    Give me a minute to think.

19       Q    Sure.  You've got till 3:35.

20       A    So the question is:  Have I ever given an

21   employee a list of things that they need to improve on?

22            Yeah, I would say yes.

23       Q    To either Najdat or Amir, did you?

24       A    I would not have given one to Amir.  It's

25   really the responsibility of the direct manager.  It's

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

Page 58

1    not my responsibility to do that.

2            And with Amir, or any direct report, if there

3    were significant shortcomings, I most likely would have,

4    you know, written a -- let's say I -- I would type up a

5    Word document talking points for that meeting, and say,

6    "Hey, I want to go over these items with you.  These are

7    the areas that you need to -- you need to improve."

8            But I don't do a lot of -- I wouldn't be

9    e-mailing that around.  That's something I would prepare

10   either handwritten or type it up in Microsoft Word and

11   bring it to the meeting and say, "Hey, Joe, these are the

12   things that you need to -- you know, need to hit your

13   mark on."

14       Q    Did you specifically type up or handwrite such

15   a list related to Najdat?

16       A    Not that I remember.

17       Q    Were you ever asked to look on your computer

18   for any such documents as a part of this litigation?

19       A    I was not.

20       Q    Do you recall a meeting in Atlanta with Najdat

21   in March of 2012 where Amir was discussed?

22       A    No.

23       Q    Okay.

24       A    That's not to say the meeting didn't take

25   place.  I don't --

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1        Q    Fair enough.

 2        A    -- I don't remember something from three years

 3   ago.

 4        Q    Okay.  Do you remember -- or did you meet with

 5   Amir in Atlanta around that time?

 6        A    You know, I -- I read -- I mentioned to you

 7   that I read Najdat's deposition, and he mentioned that he

 8   did.

 9             I don't remember the meeting.  But if Najdat

10   said that I -- you know, that I did have a meeting, and

11   if he's telling the truth, then I did.  I wouldn't refute

12   something Najdat said.  But I do not remember the

13   meeting.

14        Q    Okay.  Let me ask you this:  Is there anything,

15   whether it's a time record or a calendar or any

16   documentation that you would be able to go back and look

17   at for, say, sometime last year and determine where you

18   were on a particular day?

19        A    For 2014?

20        Q    Anytime in the past.

21        A    It just depends.  I keep my calendar

22   electronically on Outlook.  Some things are on the

23   calendar; some things aren't on the calendar.  I guess it

24   would be a function of did I put, you know, certain

25   things on the calendar, and how long does the IT Outlook
```

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

Page 60

1    calendar process retain information.

2        Q    Okay.

3        A    If it was something last year, I could probably

4    scroll backwards on the calendar and look for it.

5        Q    Is there any type of time record that you keep

6    to just show what you did in the -- on a given day to

7    justify your paycheck that you -- that you would keep?

8        A    No, because it would be bragging because I get

9    so much done in a day.

10            No, no, in all seriousness, I don't keep a time

11   record.

12       Q    For instance, as a lawyer, we have to write

13   down what we do because we send you a bill for it.

14       A    Right.

15       Q    You don't keep --

16       A    No.

17       Q    -- a daily log of activities of what you did

18   and what you accomplished?

19       A    No.  No.  I understand the question.  We don't

20   have a vouchering towards certain projects or

21   initiatives.  I do not have that.

22       Q    To be certain before I move on, I think I have

23   talked to you about Najdat's termination, and I think

24   we've discussed every reason and every justification that

25   went into that termination.

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

| | | |
|---|---|---|
| 1 | A | (Nods head.) |
| 2 | Q | Have we? |
| 3 | A | Yes, we have. |
| 4 | Q | Okay.  So there's nothing else out there that |

5   went into the decision to terminate Najdat that we

6   haven't talked about at this point; is that fair?

7        A     That's correct.

8        Q     Okay.  I want to move on and talk about Amir

9   Shaiegan a little bit.

10       A     Okay.

11       Q     Do you remember when Amir was hired at HD

12   Supply?

13       A     When he was originally hired?

14       Q     Well, I'm going to go ahead and clear this up

15   now.  I know that he worked at one point from 2006 until

16   2010, left and then came back in 2011.  Okay?

17             I'm talking about the second time starting in

18   2011.  Okay?  Do you remember when he was hired at that

19   point?

20       A     I think he was already there when I -- when

21   I rejoined.  Remember, I left the company from -- I think

22   I left in the first of March of 2010 and then came back

23   the first week of April of 2011.  And you know, without

24   looking at -- at, you know, employment records, I'm --

25   I -- I suspect that he was already back in the company

Steven Margolius - 4/23/2015

1    when I came back to the company, but I'm not positive.

2         Q    You did not have anything to do with the

3    decision to hire him?

4         A    To re-hire him?

5         Q    Right.

6         A    I did not.

7         Q    Typically, when -- if Najdat was going to hire

8    someone in the, say, the role that Amir was in, is that

9    something that he would need to get your approval to

10   do?

11        A    In -- in some cases.  There's certain positions

12   where if a vice president that works for me, you know,

13   has interviewed a slate of candidates and, you know, has

14   told me that, you know, he's gone through an exhaustive

15   process, he's done the reference checks, and he's got the

16   perfect candidate, I'll trust that, and let him go hire

17   that individual.  In other cases, depending on the

18   responsibilities of the position, I'll ask to be involved

19   in interviewing the two finalists.

20        Q    Tell me what you recall about Amir's

21   termination.  And when I say "what do you recall," we've

22   talked about the reasons; the poor performance continuing

23   over a period of time; talking about the actual act of

24   terminating Amir.

25             What do you recall about that?

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

Page 63

1      A     The only thing I remember is, you know, Najdat
2   told me, you know, a day or a date that he was going to
3   be having the discussion.  I remember him telling me that
4   he, you know, completed the discussion.  I remember, you
5   know, following up and asking if Amir had accepted the
6   severance package that was offered to him, and that --
7   that's -- that's about it.
8      Q     Okay.  And again, I may have asked this, I hope
9   not, but ultimately who made the decision Amir is going
10  to be terminated?
11     A     Yeah, I believe this was a joint decision
12  between Najdat and I.  I know that we had, you know, some
13  very in-depth discussions about Amir's lack of
14  performance and his inability to improve that
15  performance, despite repeated coaching from Najdat.
16          And, you know, my -- my recollection would be
17  that Najdat said to me, "Let's forego this process and
18  move to termination."
19          And now I can't -- I don't have that, you know,
20  like written down in an Outlook calendar that we had that
21  discussion, but I think the discussion was along the
22  lines of Najdat concluded that, "This is not going to
23  work.  It's not going to get better."  Am I okay with
24  moving directly to termination?
25          And I would have said, "Yes."

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1        Q    Okay.  I think you just said that over time,
 2   y'all had numerous extensive discussions about Amir's
 3   poor performance.
 4             Other than what is marked as Exhibit 2 --
 5        A    Yes.
 6        Q    -- are you aware of any documentation anywhere
 7   at HD Supply that would document that poor performance?
 8        A    I'm not, no.
 9        Q    Okay.  And you've never done any type of search
10   electronically or for hard copies of documents to see if
11   such documents exist?
12        A    Correct.
13        Q    Okay.  I'm trying to find what -- what -- my
14   recollection is -- and this is no better than anyone
15   else's -- but my recollection was that following
16   Exhibit 2 where Najdat sent that performance plan to you
17   for your review, that Najdat indicated at that point, you
18   said, "No, let's go ahead and terminate him instead."
19             Do you recall that being the way it went down
20   or --
21        A    No, my recollect -- my recollect --
22   recollection would be, you know, after numerous
23   conversations about the failures in that part of our
24   business, Najdat and I having a discussion about the
25   performance improvement program, and I believe that his
```

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1    recommendation is that -- was that we forego -- that we

2    forego it.  And I -- you know, I was the ultimate

3    decision maker.

4              So if that was the recommendation by the vice

5    president that I was responsible for this individual,

6    then I would have approved it.

7        Q    Here's what -- well, I'm paraphrasing -- but

8    here's what Najdat had to say; that he put together that

9    performance plan, sent it to you.  And after he sent it

10   to you, you told him that you had already set up a

11   one-on-one with Amir.  And at that point, you recognized

12   that Amir was not engaged, and you made the decision to

13   not pursue the plan, but to terminate him instead.

14       A    Umm-hmm.

15       Q    Does that refresh your recollection at all?

16       A    No.  I think -- I think that's something that I

17   read in Najdat's deposition.

18       Q    Okay.

19       A    I don't remember -- you know, I told you

20   earlier that I do have weekly updates with my direct

21   reports.  Then on occasion --

22       Q    Sure.

23       A    -- I do what's called a "skip level" and speak

24   to the next person down.

25              I will tell you that I would not have had a

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1    discussion with Amir sitting in my office or his office

2    or conference room and assess him and then come out of

3    this meeting and say, "This guy" -- what was the phrase

4    that you used?

5        Q    "Not engaged."

6        A    Yeah, that would not have happened.

7        Q    Okay.  In fact, Najdat says that you didn't

8    even ask for his input when making the decision to

9    terminate Amir.

10           Do you disagree with Najdat's assessment of

11   that?

12       A    Please say that again.

13       Q    He said in his deposition that you didn't even

14   ask him -- "him" being Najdat -- for his input in making

15   the decision to terminate --

16       A    No.

17       Q    -- Amir.

18       A    That would -- that would be ridiculous and

19   untrue.

20       Q    And I'm not trying to say either one of you is

21   not telling the truth or remembering it wrong.  I'm just

22   really trying to figure out who made the decision.

23       A    Yeah, I --

24       Q    And you're telling me it was a joint decision

25   based upon extensive discussions between the two of you

Steven Margolius - 4/23/2015

1    regarding Amir's performance over a continued period of

2    time?

3         A    Right.  But he is right in that, you know, I

4    ultimately would make the decision.

5         Q    Sure.

6         A    Agree with his conclusion and make the

7    decision.

8         Q    Okay.  He -- what Najdat said was that you met

9    with Amir.  I guess we call that the --

10        A    Like a skip-level thing.

11        Q    -- skip-level meeting.

12             "After the meeting between Steve and Amir,

13   Steve made the decision himself to just terminate Amir?"

14             He said, "Correct."

15             "Did he talk to you before that and ask for

16   your input before making the decision?"

17             Then, "No, he did not."

18             So, okay, I understand what you say, the way

19   the discussion -- the decision was made, not -- let me

20   put a piece of paper in front of me.

21             You weren't present at the meeting where Amir

22   was terminated; is that right?

23        A    Right.

24        Q    Following the skip-level meeting, assuming it

25   happened, did you ever talk to Amir again?

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

Page 68

```
 1        A     Well, first, I -- I don't know when this --
 2   this skip-level meeting happened, or if it did happen.
 3        Q     Okay.
 4        A     I'm saying that it's -- Najdat's correct that I
 5   do have those kind of meetings, but the --
 6              MR. HALEY:  No, no, not you.
 7              I'm sorry.  Forgive me.  I'm getting
 8   instructions from the videographer.
 9              THE WITNESS:  Okay.  I lost my train on your
10   question.
11   BY MR. LASLEY:
12        Q     Okay.  What I'm trying to figure out --
13              MR. HALEY:  Sorry.
14              THE WITNESS:  That's okay.
15              MR. LASLEY:  That was probably a bad question.
16   BY MR. LASLEY:
17        Q     I think both Amir and Najdat have indicated
18   that you met with Amir in Atlanta sometime in March of
19   2012.  Okay?  I know that Amir was terminated second week
20   in April of 2012.  Let's just go from the date he was
21   terminated.
22              From the date that Najdat told him he was
23   fired, have you talked to Amir since that date?
24        A     I have not.
25        Q     Okay.  Have you talked to anyone about Amir
```

Steven Margolius - 4/23/2015

1  since that date other than your lawyers in dealing with

2  this case?

3       A    I have not.

4       Q    Did HR at any point contact you and talk to you

5  about any complaints Amir had made at or after the time

6  he was fired?

7       A    So this is from April 2012?

8       Q    Correct.

9       A    I was -- the only thing I can clearly tell you

10 that I remember about that is that they told me that he

11 didn't sign -- he didn't accept the package and sign off

12 on his severance payments.

13      Q    Okay.  That was --

14      A    Beyond that, I don't know.

15      Q    And Najdat told you that?

16      A    I think someone from HR told me that.

17      Q    Okay.  Did anyone talk to you about specific

18 complaints that Amir had made at the time or after he was

19 terminated?

20      A    I'm not -- I'm not following your question.

21      Q    At the time that Amir was terminated or after,

22 so I'm going to take it from the second week of April

23 till today, has anyone at HD Supply, or anyone other than

24 your lawyers, I guess, told you of any specific

25 complaints that Amir Shaiegan has made about HD Supply or

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1   anybody that works there?

 2        A    Did you say including lawyers?

 3        Q    Not including lawyers.

 4        A    Oh, not including lawyers.

 5        Q    Yeah.

 6        A    Yes.  I don't know how many months after his --

 7   his termination I was made aware of a complaint that he

 8   had.

 9        Q    Who made you aware of that complaint?

10        A    Boy, it might -- it must have been someone in

11   Human Resources so -- or legal.

12        Q    Robert Joseph or Cindy Cheskco?

13        A    Well, they were the two HR people that -- that

14   worked for me.  Rob was the vice president, and Cindy was

15   I think a director that worked for Rob, so -- and it

16   would have been either Susan -- I mean, either Cindy or

17   Rob that I had asked, you know, "Has Amir accepted his

18   severance package?"

19        Q    What complaints did they make you aware of?

20        A    I heard a -- a story that it was along the

21   lines of Najdat and Amir had made a business trip over

22   to -- you know, to look -- look for foreign companies

23   that we could source product from, and then on that trip,

24   Najdat had asked Amir to withdraw funds from an ATM

25   machine and to use them for illicit purposes.
```

Steven Margolius - 4/23/2015

1    Q    Okay.  Is that the only complaint you were ever
2    made aware of?

3    A    It is.

4    Q    Okay.  Let me talk about that just a little

5    bit, and unfortunately sometimes in these situations we

6    have to talk about the illicit thing, so --

7    A    Yeah.

8    Q    -- so I'm not trying to be offensive in any

9    way, shape, or form.

10   A    I understand.

11   Q    At any point while you were working with Najdat

12   Haydar, did you ever become aware of him hiring

13   prostitutes?

14   A    No.

15   Q    Okay.

16   A    Well, could you ask that question again,

17   please?

18   Q    Sure.

19        As you sit here today, do you know or have you

20   ever been told of anytime when Najdat Haydar hired

21   prostitutes?

22   A    No.

23   Q    Have you ever been on business trips with

24   Mr. Haydar?

25   A    I have not.

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1         Q      Has anyone ever told you -- other than this one

 2    complaint by Amir -- of Mr. Haydar acting inappropriately

 3    on business trips?

 4         A      Say that again, please.

 5         Q      Has anyone ever told you of Mr. Haydar acting

 6    inappropriately on business trips?

 7         A      No.

 8         Q      Okay.  And when I say "inappropriately," I

 9    guess it depends on who you are and what inappropriate

10    is.

11         A      Yeah.

12         Q      By that, I mean doing anything illegal, hiring

13    prostitutes, what would be illegal here, I guess.

14         A      Yeah.

15                No, no.  He was -- never anything like that.

16    You know, I -- you know, saw his expense reports.  He was

17    very frugal with company money, you know, very

18    responsible, and no -- no issues at all with him.

19         Q      Okay.  I think you told me earlier that Cindy

20    Cheskco is no longer with the company; is that right?

21         A      That's correct.

22         Q      Do you know where she is?

23         A      I do not.

24         Q      Other than the -- or someone telling you about

25    this one complaint about the overseas trip and Najdat
```

Steven Margolius - 4/23/2015

```
 1   wanting Amir to withdraw money so he could use it for

 2   illicit purposes, do you know any more specifics about

 3   Amir's complaints that he voiced to HR at the time he was

 4   fired?

 5        A    I do not.

 6        Q    Okay.  Were you ever involved in any

 7   discussions with HR about Amir's complaints other than

 8   them telling you what he said?

 9        A    No, no.  I haven't been involved or heard any

10   of that.

11        Q    Okay.  Are you aware of where this business

12   trip that Amir and Najdat went on, where they went?

13        A    Yeah.  I -- I -- I believe they went to -- I

14   think they went to India.  They were looking -- you know,

15   the purpose of the trip was to find a new source for

16   copper.

17             Our business spends a tremendous amount of

18   money buying copper, and Najdat had told me that there is

19   a potential source, you know, from a conglomerate based

20   in India that either held a company somewhere else in the

21   world, or had, you know, mining or production facilities

22   in India, and he wanted to go there with Amir to explore

23   that.

24             I think it was really to meet with a

25   principal -- you know, some principals.  And then he told
```

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1    me that they were going to be stopping in Dubai on the

2    way back.  And then there was another commodity -- and I

3    don't remember what that was -- that he wanted to speak

4    to or visit another factory.  And then they were going to

5    continue back in the States.

6         Q    Were you aware of that trip before it took

7    place?

8         A    Yeah, he had to ask -- get my approval for

9    it.

10        Q    Okay.  As far as you know, were all of HD

11   Supply's policies adhered to in planning that trip and

12   booking that trip?

13        A    I wasn't aware of anything improper on it.

14        Q    Okay.  And you're not aware anything of

15   improper as you sit here today?

16        A    As far as the booking of the trip and --

17        Q    The planning, the booking, going -- going where

18   they went?

19        A    No, I'm not aware of anything improper.

20        Q    Okay.  Do you know what suppliers they met with

21   in Dubai?

22        A    I -- I don't.

23        Q    At some point, I assume you were told who they

24   were planning on meeting with in Dubai?

25        A    Yeah, he -- in one of my one-on-ones with

Steven Margolius - 4/23/2015

1  Najdat, he outlined the trip for me.  And then in a

2  subsequent discussion, you know, he said that he thought

3  it made sense to bring Amir with him.  I asked him why

4  that made sense.  And he said that it's preferred when

5  negotiating with suppliers to have more than one person

6  in the room, and I agree.

7      Q    Why Amir if he's such a poor performer?  Why

8  not someone else?

9      A    I think some of the categories that they were

10 looking at, or the products, were in areas that Amir had

11 initiatives related to.

12          I'm not positive, but I think -- I mean, I

13 asked the same question.  Why -- why does -- you know,

14 "Why Amir?  Why not Joe, Bill, or Tom, or one of the

15 other guys?"

16          And I think it was -- it was tied to the fact

17 that Amir was working on some proprietary brands

18 projects, like I explained, private labeling on things,

19 and I think that was the reason why he was picked for

20 that trip.

21     Q    And I think you said -- let me just make sure

22 I'm clear -- that that trip had to be approved by you

23 beforehand?

24     A    Yes.

25     Q    And you did approve it?

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1       A     I did.

2       Q     And you were aware that they were going not

3    only to India but to Dubai?

4       A     Right.

5       Q     Okay.

6       A     And I questioned -- I questioned the travel

7    route.  And the stop in Dubai was to meet with another

8    manufacturer and try to check off the box and see if we

9    could get a program with that -- with that firm.

10      Q     When Amir was terminated -- let me -- I'll go

11   ahead and mark this as an exhibit just to be consistent.

12            I'll give you what I've marked as Exhibit 3.

13            (Exhibit 3 was marked for identification.)

14   BY MR. LASLEY:

15      Q     Have you ever seen that document before?

16      A     No.  And, you know, as I look at this, I can't

17   remember ever seeing one.

18            I know, you know, typically when an employee is

19   terminated, the manager, you know, will sit in a

20   conference room or a -- an office with the employee, have

21   the discussion.  And then usually there's a HR person in

22   the room as well or in the next room.

23            And as part of that process, they collect

24   the -- or make arrangements to collect the computer, the

25   telephone, and any other company property.  And then the

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

1  next step is -- is a Human Resource person will go over

2  the document.  But I've never actually seen one of the

3  documents.

4        Q     Okay.  And the reason I wanted to talk to you

5  about that is in there on Paragraph 2, it says that

6  employee, which is Amir, would receive $26,166.67 in

7  return for signing that agreement.

8              Who -- who came up with that number?

9        A     Well, I don't -- I -- I don't know.  I can

10  only -- I can only make a presumption about that.  I

11  don't know the answer to that question.

12       Q     Not you?

13       A     No.

14       Q     I guess my question is just your role, once you

15  as the supervisor make the decision that someone's going

16  to be terminated, at that point, it gets turned over to

17  HR and legal; is that fair?

18       A     Well, there are some things that I still get

19  involved in in that process.  But once a decision is made

20  to terminate an employee, there's several different

21  things that -- that take place.  You know, one is the

22  development of the separation agreement.  And then when

23  it comes to compensation or other benefits like

24  out-placement benefits, or does the individual get to

25  keep his or her cell phone, you know, some of those

Steven Margolius - 4/23/2015

1    things are discussed with me.

2           But as far as, you know, these agreements, you

3    know, as I said, there's different people, depending on

4    which function they're in, the legal function, the HR

5    function, sometimes finance get involved in construction

6    to details.

7       Q    As far as Amir's termination, other than your

8    discussions with Najdat and your mutual agreement, as you

9    put it, to terminate Amir, did you have any other

10   involvement in the termination?

11      A    Not -- not that I remember.

12      Q    Okay.

13      A    I may have been involved in a discussion about

14   whether or not he keeps his cell phone because that seems

15   to be a big thing, people like to keep their phone.  But

16   other than that -- I don't -- I don't remember being

17   involved in any details.

18      Q    Okay.  I'm going to hand you Exhibit 4.

19           MR. HALEY:  Thank you.

20           (Exhibit 4 was marked for identification.)

21   BY MR. LASLEY:

22      Q    Have you seen that document before?

23      A    No.

24      Q    Okay.  Did you play any role in determining,

25   again, in Paragraph 2, the amount of payment being

Steven Margolius - 4/23/2015

```
 1   offered to Najdat in this separation agreement?
 2        A     I may have.  And the reason I say that is
 3   because he was a vice president of the corporation,
 4   there -- there may have been a discussion between myself
 5   and Human Resources about whether he gets not only the
 6   standard package, but was there anything else that we
 7   would offer to him in terms of a certain amount of
 8   out-placement services from our company, like Drake Beam,
 9   again, the thing with the cell phone, and I think that
10   would be the extent of it.
11        Q     You mentioned the standard package.
12              What is the standard package?
13        A     You know, there's basic guidelines depending
14   on -- I don't think there -- there are actually rules,
15   but there's some guidelines relative to a person's level
16   in the organization.
17              So whether they're a director or vice president
18   has an impact on how the compensation package is
19   constructed.
20              Also, length of employment in the company is --
21   is another factor, and those are -- those are usually
22   considerations that are discussed between -- usually with
23   a senior person in Human Resources, you know, to do its
24   best.
25        Q     Okay.  Exhibit 3, which is a separation
```

Steven Margolius - 4/23/2015

Page 80

1    agreement that was offered to Amir, is dated April 13,

2    2012.

3            If you would look just to verify that for me,

4    on paragraph -- numerical paragraph 1.

5        A    Yeah, April 13th, 2012.   Yes.

6        Q    Okay.   And then on Exhibit 4, Najdat's

7    termination date on his separation agreement is listed as

8    April 17th, 2012; is that correct?

9        A    Yes, it is.

10       Q    Okay.   Is it your testimony, Mr. Margolius,

11   that despite the proximity in time, these two separation

12   agreements -- that Amir's termination and Najdat's

13   termination had nothing to do with one another?

14       A    That is -- that is correct.

15       Q    Okay.   At the time that Amir was terminated,

16   which was the 13th, did you know at that point that

17   Najdat was going to be terminated?

18       A    Boy, I don't -- I don't know.   I can't remember

19   from -- from that -- that far back.

20       Q    Okay.

21       A    It's likely that, you know, I wouldn't have

22   woken up on the morning of the 17th and said, Today's --

23   today's the day for Najdat."   So it's likely that prior

24   to that, but I can't attest to the -- to the date.

25       Q    Okay.   Prior to Amir being terminated, did you

Steven Margolius - 4/23/2015

1    or did anyone make you aware of the fact that Amir had

2    tried to schedule a meeting with Robert Joseph?

3         A    Say -- repeat the first part, please.

4         Q    Prior to being terminated -- Amir, prior to him

5    being terminated, did anyone make you aware of the fact

6    that he was trying to set up a meeting with Robert

7    Joseph?

8         A    No.

9         Q    Okay.  Had you ever heard that before today,

10   that Amir had tried to set up a meeting with Robert

11   Joseph shortly before he was terminated?

12        A    No.

13        Q    Okay.  And I assume since you didn't know about

14   that, that it would be your testimony that his attempts

15   to talk with Robert Joseph in no way played a part in his

16   termination?

17        A    Say that again.  I'm not following you.

18        Q    Well, if you weren't aware that he had tried to

19   set up a meeting with Robert Joseph, I'm assuming it

20   would be your testimony that his attempts to meet with

21   Robert Joseph had no impact on him being terminated?

22        A    Yeah, that's correct.  Any -- any attempts for

23   him to talk to Rob Joseph would have no bearing on his

24   employment status.

25        Q    Okay.  Did you speak with Rob Joseph or Cindy

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

02974339-48db-493e-97d9-3513a233dea4

1    Cheskco after Amir's termination specifically about

2    Amir's complaints to them concerning Najdat and the Dubai

3    trip?

4        A    Oh, as I said, at -- at some point after Amir's

5    termination, and I can't remember if it was Cindy or if

6    it was Rob, one of them had mentioned to me that while

7    they were on that trip, Amir was -- Amir was saying that

8    Najdat asked him to withdraw money from an ATM machine.

9        Q    Okay.  Did they tell you that Amir was

10   complaining that Najdat was trying to talk him in to

11   frequent prostitutes with him?

12       A    I had heard that later on, yes.

13       Q    Okay.  Who did you hear that from?

14       A    Either Rob or Cindy.

15       Q    Okay.  Anything else they told you about Amir's

16   complaints, anything else he was upset about?

17       A    No.

18       Q    Okay.  When did you first become aware of

19   Amir's claim against HD Supply?

20       A    Oh, boy.

21       Q    And again, just make sure you don't tell me

22   anything your lawyers told you.

23       A    Yeah.  I don't know the answer to that.  All I

24   can assume is that -- is that shortly after -- and this

25   is the common practice in the business -- when legal

Steven Margolius - 4/23/2015

1  counsel receives notice that there's any type of legal

2  action, it could be a product liability thing or an

3  employment thing, since I was the, you know, senior

4  person in the business, I would have been notified, you

5  know, probably within days of the legal department being

6  notified.

7      Q    And I think you told me earlier that at no

8  point do you remember legal or anyone at HD Supply

9  sending you a litigation hold telling you to reserve

10 documents relating to Amir Shaiegan; is that right?

11     A    That's right.

12     Q    Okay.  What was Rob Joseph's role in dealing

13 with Najdat and Amir Shaiegan?  Was it solely a Human

14 Resources role?

15     A    Yeah.  Rob -- Rob's responsibility was vice

16 president of Human Resources for the whole -- the whole

17 business unit -- not the company, but the business unit.

18 So his -- his role would have been to, you know, just

19 serve as the -- the -- the top HR leader for the

20 business.

21     Q    And the reason I asked you that question is

22 there was some discussion in Mr. Joseph's deposition

23 about this meeting Amir was trying to schedule, and Rob

24 Joseph recalled it that Amir had asked to meet with him

25 to discuss Amir's career path.

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

Steven Margolius - 4/23/2015

Page 84

```
 1            And my understanding of the way that HR works,
 2   Rob Joseph could do nothing to help Amir with his career
 3   path; isn't that true?
 4            If he was talking about career path, I think he
 5   would talk to someone like you instead of Rob Joseph.
 6            Does that make any sense to you?
 7       A    Well, it could -- I don't quite understand the
 8   question.  I want to answer it correctly.
 9       Q    Then don't answer it.
10       A    Yeah, no.
11       Q    What I'm trying to find out is it doesn't make
12   sense to me that Amir Shaiegan would schedule a meeting
13   with Robert Joseph to discuss Amir's career path?
14       A    Umm-hmm.
15       Q    It seems to me like that was a meeting that
16   should been held with someone, say, in your position to
17   discuss a career path.
18            Can you make any sense of that?  Why Amir would
19   wanted to talk to Robert Joseph about his career path?
20       A    Yes.
21            MR. HALEY:  I'm going to object -- I'll object
22   to form, but go ahead.
23            THE WITNESS:  Yes.
24   BY MR. LASLEY:
25       Q    Explain to me how that makes sense.
```

Steven Margolius - 4/23/2015

```
 1      A     There's multiple paths in our company for an

 2   individual to explore career opportunities.  You know,

 3   one is with your direct manager, you know, just as you

 4   said, and that's very true.  The other one is to talk to

 5   Human Resources.

 6          And the reason for that is Human Resources has

 7   a database of open positions in the company.  So if an

 8   employee was interested in knowing -- you know, let's say

 9   I'm an accountant.  I could go to the HR person, the Rob

10   Joseph of my business, and say, "Are there higher level

11   accounting positions available in any of the other HD

12   Supply business units?  Is there an opportunity for me to

13   get a promotion in another business unit?"

14          Another -- another reason why he would go to

15   Rob would be if he was interested in maybe making a

16   cross-functional move in our business.  Maybe he wanted

17   to get into sales, or maybe he wanted to get into

18   marketing, or another function, he would go to Rob and

19   explore; A, are there openings; or B, if there's not, how

20   can I get some experiences so that when there are an

21   opening -- when there is an opening, I could be

22   qualified.  So there are several good reasons why he

23   would talk to Rob about career path.

24      Q     Okay.  That makes sense then.

25      A     Yeah.
```

CERTIFIED COURT REPORTERS AND VIDEO, LLC
(855) 227-8552

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1        Q    Are you aware of any -- I'm -- I'm going to use
 2   this term, and I don't mean it like it sounds, but a
 3   policy and procedures manual?  It might be electronic.
 4   It might be online.  But tell me where HD Supply keeps
 5   all of their policies and procedures for their employees
 6   to know how they are supposed to handle certain
 7   situations?
 8        A    Yeah.  There's a -- there is a -- on our
 9   Intranet, you know, the internal web for the business,
10   there is a -- on the master -- on the home web page,
11   there is a tab -- it's either under legal, or it's under
12   Human Resources, and it spells out the company policies
13   and procedures.  You know, they're indexed, and you can
14   click on them.
15        Q    Can those things be printed out?
16        A    I don't know.  I've never tried to.
17        Q    Okay.  Do you have any idea whether or not
18   there is a harassment policy contained somewhere in
19   there?
20        A    I'm sure there is, yes.
21        Q    Do you, as you sit here today, know whether or
22   not Amir Shaiegan or -- or/and Najdat Haydar were ever
23   asked to acknowledge the harassment policy of HD
24   Supply?
25        A    Each -- each year every associate has to go
```

CERTIFIED COURT REPORTERS AND VIDEO, LLC
(855) 227-8552

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1   through a -- a company policy acknowledgment process.

 2   It's -- it's on -- it's been online the first -- the last

 3   couple of years where you have to go through the

 4   policies.

 5           There's training courses, online training

 6   courses, on each policy.  And then when you complete

 7   those, you receive a -- a -- an online certificate saying

 8   that you've completed the process.  It's mandatory.  It's

 9   not optional.  HR is able to track those who have not --

10   you know, not made the time to do it.  So I am aware of a

11   process about that.

12       Q    And that's done annually?

13       A    Annually, yeah.

14       Q    So somewhere someone should be able to give me

15   something that shows that Amir and Najdat did that in

16   calendar year 2011?

17       A    I can't speak to the record retention policy of

18   the company, but -- but I -- I can tell you myself,

19   personally, in January and February, I went through all

20   the policies and checked them off and --

21       Q    Okay.  What about training?  Do the employees

22   at HD Supply have any sort of harassment training either

23   at the time they're hired and through an orientation

24   process or at any continuing level while they work

25   there?
```

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
1        A     Yes.
2        Q     Okay.  Tell me what training happens, takes
3   place?
4        A     Yeah.  So this is the -- it goes hand in hand
5   with the company policy acknowledgment.  So, you know,
6   for example, in January, as I mentioned, I had to spend I
7   think it was five or six hours over the course of a month
8   going through these different training modules.
9              So it was a -- a module on sexual harassment.
10  There is a module on Foreign Corrupt Practices Act.
11  There is a module on interactions with suppliers.  There
12  is a module on environmental health and safety.  There is
13  a module on preventing and responding to work --
14  workplace violence.  I think there's like eight -- I
15  can't -- I -- eight, ten -- I don't know how many of
16  these were, but they're -- you know, you sit in your
17  office, they're online on your computer, and they've
18  designed them so that you actually have to sit there.
19  You can't leave because every 30 seconds --
20       Q     Like legal webinars now --
21       A     Yeah.
22       Q     -- if you go to the restroom, you don't get the
23  credit because you didn't click in time.
24       A     Exactly.  So you sit there.
25             And it's actually very good.  I think it's
```

Steven Margolius - 4/23/2015

1   fantastic training that our HR and legal people have

2   developed.  But at the end of each model, you click

3   "done" after, you know, everything's been finished, and

4   then you receive a -- a confirmation thing pops up on

5   your screen, and you do a screen print, and you retain

6   that.

7        Q    Okay.  How long have they been doing that

8   training?

9        A    I'm not quite sure how many years.  It's been

10  several years.

11       Q    So do you think it dated back to at least 2012,

12  '11?

13       A    I'm not positive.

14       Q    Who would know the answer to that?

15       A    Susan Stucker would know.

16       Q    How long has Susan been there?

17       A    I have been with the company other than that

18  one year break since 2006, and I'm pretty sure Susan had

19  been there most of that time.  So she's been there quite

20  a while.

21       Q    Oh.

22       A    Outstanding attorney.  She would have the

23  answer to that.

24       Q    Have you ever discussed with anyone, other than

25  your lawyers, whether or not Amir had made complaints of

Steven Margolius - 4/23/2015

1    harassment by Najdat?

2        A    Have I heard --

3        Q    Have you heard that --

4        A    Oh, no.

5        Q    -- or talked about it with anybody?

6        A    No.

7        Q    When did you become aware of this lawsuit?

8        A    I received a notice from Susan right after he

9    filed it --

10       Q    Okay.

11       A    -- so it probably would have been -- she's

12   usually pretty quick, so a week or two.  I don't even

13   remember what year that was, so --

14       Q    Other than Susan, did you discuss it with

15   anyone at that point when you found out about the

16   lawsuit?

17       A    No.

18       Q    You didn't called Robert Joseph or Cindy

19   Cheskco or anybody --

20       A    No.

21       Q    -- talk to your supervisor about it, Rick

22   McClure?

23       A    No.

24            Usually when I get -- when I get correspondence

25   with Susan, I only speak with Susan about those.

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1        Q    Okay.  Let's take a quick break and go off the
 2    record for a second.  I'm going to look at my notes.
 3        A    Okay.
 4        Q    I'm probably just about finished.
 5        A    Okay.
 6        Q    So I'm going to make sure I --
 7             THE VIDEOGRAPHER:  This marks the end of Media
 8    No. 1 in the deposition of Steve Margolius.  Going off
 9    the record.  The time is 11:17 a.m.
10             (Recess taken.)
11             THE VIDEOGRAPHER:  This marks the beginning of
12    Media No. 2 in the deposition of Steve Margolius.
13    Today's deposition is being held at 4747 Executive Drive,
14    Suite 1000, San Diego, California, 92121.  Videographer
15    is Scott Tanaka here on behalf of Dallas Video Concepts.
16    Today's date is April 23rd, 2015.  Back on the record.
17    The time is 11:26 a.m.
18                  EXAMINATION RESUMED
19    BY MR. LASLEY:
20        Q    Mr. Margolius, we just took a break, and I've
21    gone through my notes, and I've got just a few more
22    questions, and we can wrap this up.
23             I just wanted to make sure that the record's
24    clear.  I think you have told me here today that Amir
25    Shaiegan's employment at HD Supply was terminated due to
```

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1    continued poor performance over a continued period of
 2    time.
 3            Is that correct?
 4    A     That's correct.
 5    Q     And I also believe that you've told me that
 6    there were ongoing, extensive discussions between you and
 7    Najdat Haydar concerning Mr. Shaiegan's poor
 8    performance?
 9    A     Yes.
10    Q     Okay.  Have we discussed everything you know
11    about Amir Shaiegan's employment and termination from HD
12    Supply today?
13    A     I believe we have, yes.
14    Q     Okay.  Is it your testimony that Mr. Shaiegan's
15    complaints about Najdat Haydar and the way Mr. Haydar had
16    treated him had no effect whatsoever on Amir's employment
17    at HD Supply?
18    A     That's correct.
19    Q     And is it also your testimony that Amir
20    Shaiegan's complaint about Najdat Haydar had no impact on
21    Najdat Haydar's employment at HD Supply either; is that
22    true?
23    A     Not -- I'm having trouble answering the
24    question --
25    Q     Okay.
```

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

Page 93

```
 1      A    -- because I don't know the complaints that
 2   you're referring to.
 3      Q    Okay.  You learned at some point that Amir
 4   Shaiegan had made complaints to HR about the way Najdat
 5   acted on the trip to Dubai; is that fair?
 6      A    Yes, I learned that post Amir's departure from
 7   the company and post Najdat's.
 8      Q    So I guess it would follow then that Amir's
 9   complaints about Najdat did not lead to Najdat being
10   fired?
11      A    No.  Najdat was terminated for the reasons
12   that -- you know, we parted ways with Najdat for the
13   business reasons that I described to you earlier.
14      Q    Okay.  Other than the trip to Dubai and the
15   complaints that we've talked about that Amir had with the
16   way that Najdat acted on that trip, are you aware of any
17   other complaints that Amir had about Najdat while Amir
18   worked at HD Supply?
19      A    I am not.
20      Q    Okay.  Did Amir ever talk to you about any
21   problems he was having with Najdat?
22      A    No.
23      Q    Okay.  Did Najdat ever talk to you about any
24   complaints Amir had made?
25      A    No.
```

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

Steven Margolius - 4/23/2015

1    Q    Okay.  And no one at HR ever told you that Amir

2    had complained about the way Najdat was treating him?

3    A    No, I never -- are you asking:  Did I hear

4    anything from HR about the way Amir felt Najdat was

5    treating Amir?

6    Q    Correct.

7    A    No, I was not aware of any complaints.

8    Q    Okay.

9         MR. LASLEY:  I'm going to go ahead and mark

10   this deposition notice as Exhibit 5 to the deposition

11   just to have it in there.

12        (Exhibit 5 was marked for identification.)

13        MR. HALEY:  I lost my thing.

14   BY MR. LASLEY:

15   Q    I'm going to hand you one more document,

16   Mr. Margolius --

17   A    Okay.

18   Q    -- mark it as Exhibit 6.

19        (Exhibit 6 was marked for identification.)

20   BY MR. LASLEY:

21   Q    Ask you if you've ever seen that document

22   before, that second part?

23   A    No, I've never seen this document before.

24   Q    Okay.  Then I guess you can't explain it to me,

25   if you've never seen it.  Or can you?

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1    A    I can't explain this document, no.

2    Q    In the -- in the document, Exhibit 6 there, the

3    bottom half of it appears to be an e-mail from Cindy

4    Cheskco to Rob Joseph, and she says, "Hi, Rob, Anne

5    reviewed the files and did not see any inappropriate

6    pictures.  Most pictures were from a trip to India, his

7    family, and remodeling."

8            Do you know what files they're talking about?

9    A    I can offer a guess.  I don't know if that's --

10   you're interested in --

11           MR. HALEY:  As long as you characterize it as a

12   guess.

13           THE WITNESS:  Yes.

14   BY MR. LASLEY:

15   Q    Tell me what your guess is.

16   A    My guess is that the files that were --

17   remember earlier I mentioned that a lot of times when

18   associates leave the company, they ask to retain their

19   cell phones, and sometimes they ask to retain their

20   personal -- their personal computers, or they --

21   Q    Okay.

22   A    -- buy them at a nominal price.

23           But before we let an associate keep a company

24   device, the device is sent to the IT Department so that

25   company data, you know, financial information or anything

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1   else proprietary --
 2        Q    Sure.
 3        A    -- is removed, so -- and I'm not sure if this
 4   is referring to a telephone or a computer.  But what I
 5   think this is about is there were pictures on Najdat's
 6   telephone.  And I know that Cindy wanted to make sure
 7   that there wasn't anything inappropriate on -- on there
 8   whether it be, you know, pictures of company products or
 9   anything else that you know shouldn't be in a --
10        Q    Okay.
11        A    -- in a photograph file.
12             So when she says, "Most" trips [sic] "were"
13   taken "to India, his family and remodeling," I think what
14   she's referring to is that there was no product or
15   marketing or confidential company information contained
16   in the photo files.
17        Q    Okay.  To be clear, I have given you -- and I
18   think it's Exhibit 1 or 2.  That's the second page of
19   Exhibit 2, yeah.
20        A    This one is Exhibit 2?
21        Q    Well, let's look at both Exhibit 1 and
22   Exhibit 2.
23        A    Okay.
24        Q    Other than these two e-mails, Exhibit 1 and
25   Exhibit 2, are you aware of any document that exists,
```

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1   whether it's electronic or hard copy, that discusses Amir
 2   Shaiegan's performance while he was an employee of HD
 3   Supply?
 4        A    The only document that I would be aware of
 5   would be if there was a performance appraisal done for
 6   him, and that would be in that Peoplesoft or Oracle
 7   system that I talked about.
 8             And, you know, relative to that, I can't
 9   remember when Amir started with the company, but
10   depending, you know, how long he was in the business
11   prior to when those performance appraisals were input,
12   you know, he may or may not have one.  But I'm not aware
13   of -- to answer your -- your question, I'm not aware of
14   any other documents.
15        Q    Okay.  If I recall correctly -- strike that.
16   I'm not even going to try to recall correctly.
17             Amir was hired in May of 2011 and terminated
18   April 13th of 2012.  Okay?  Based upon those two dates
19   that we know, should there be a performance appraisal
20   somewhere for him?
21        A    There may or may not be.  I think the best road
22   would be to, you know, check the system and -- and see if
23   there is one in there.
24        Q    What would be company policy?  If someone
25   starts in the middle of the year, do they not get a
```

CERTIFIED COURT REPORTERS AND VIDEO, LLC
(855) 227-8552

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1   performance review that year?

 2       A    I don't know if there's a company policy on

 3   that.   I think it may be up to the -- up to the manager

 4   how that's handled.

 5            MR. LASLEY:  Okay.  Mr. Margolius, that is all

 6   the questions I have for you today.  I certainly

 7   appreciate you taking the time and inviting us to sunny

 8   California.

 9            THE WITNESS:  All right.  Well, thank you.

10            THE VIDEOGRAPHER:  This concludes today's video

11   deposition of Steve Margolius.  Total number of media

12   used was two.  Going off the record.  The time is

13   11:36 a.m.

14            (Whereupon, at 11:36 a.m., the proceedings

15             were concluded.)

16

17

18

19

20

21

22

23

24

25
```

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

1          DECLARATION UNDER PENALTY OF PERJURY

2

3          I, STEVEN MARGOLIUS, the witness herein,

4    declare under penalty of perjury that I have read

5    the foregoing transcript in its entirety; and that the

6    testimony contained herein, as corrected by me, is a true

7    and accurate transcription of my testimony elicited at

8    said time and place.

9

10         In witness whereof, I have subscribed my name this

     _____ of _____, 2015, at

11   _____, _____.

12        (City)              (State)

13

14

15         _____

             STEVEN MARGOLIUS

16

17

18

19

20

21

22

23

24

25

02974339-48db-493e-97d9-3513a233dea4

Steven Margolius - 4/23/2015

```
 1   STATE OF CALIFORNIA)
                        )
 2   COUNTY OF SAN DIEGO)

 3

 4        I, Deborah M. Neeley, a Certified Shorthand

 5   Reporter, in and for the State of California do hereby

 6   certify:

 7

 8        That the witness named in the foregoing

 9   proceeding was, before the commencement of the

10   proceeding, duly administered an oath in accordance with

11   the Code of Civil Procedure Section 2094; that the

12   testimony and proceedings were reported stenographically

13   by me and later transcribed through computer-aided

14   transcription under my direction and supervision; that

15   the foregoing is a true and correct record of the

16   testimony and proceedings taken at that time.

17

18        IN WITNESS WHEREOF, I have hereunto subscribed my

19   name this 12th day of May, 2015.

20

21

22

23        Deborah M. Neeley
          CSR No. 8773

24

25
```

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

02974339-48db-493e-97d9-3513a233dea4